2008 ME 106

**Paul DYER et al.**

v.

**DEPARTMENT OF TRANSPORTATION.**

Supreme Judicial Court of Maine.

Argued: May 13, 2008.
Decided: June 26, 2008.

Severin M. Beliveau, Esq., Jeffrey T. Edwards, Esq. (orally), Preti, Flaherty, Beliveau & Pachios, LLP, Portland, ME, for Paul & Robert Dyer.

Rebecca H. Farnum, Esq. (orally), Victoria E. Morales, Esq., Thompson & Bowie, LLP, Portland, ME, for Maine Department of Transportation.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Robert and Paul Dyer appeal from a summary judgment entered by the Superior Court (Waldo County, *Mills, J.*) in favor of the Maine Department of Transportation (DOT) on the Dyers' complaint alleging that DOT exceeded its eminent domain powers in taking their land. The Dyers argue that there are genuine issues of material fact in dispute regarding whether DOT abused its power in taking

all five acres of the Dyers' property.[1] We affirm the judgment.

## I. CASE HISTORY

[¶ 2] The facts are undisputed.[2] The Dyers owned the Sail Inn Restaurant and surrounding land. The restaurant had operated for over fifty years on land in Prospect, a short distance south of the Waldo–Hancock Bridge. The property consisted of approximately five acres, with frontage along the eastern side of U.S. Route 1 and sloping down to the Penobscot River.

[¶ 3] The Waldo–Hancock Bridge is a suspension bridge completed in 1931. It crosses the western channel of the Penobscot River between Prospect and Verona Island. The bridge carried traffic over the river to and from Bucksport, Ellsworth, and other downeast Maine locations. The next river crossing is fifteen miles up river in Bangor.

[¶ 4] In 1998, DOT contracted with Parsons Transportation Group to study DOT's options for rehabilitating or replacing the bridge. Initially, DOT decided to undertake necessary repairs rather than erect a new bridge. Rehabilitation was to be done in two phases; phase one involved rehabilitating the foundation and the piers; phase two involved rehabilitating the suspension system. DOT engaged SEA Consultants, Inc., to design the first phase and Piasecki Steel Construction Corp., to complete phase two.

[¶ 5] In the fall of 2002, Piasecki began opening the protective sheaths of the bridge's cables and cleaning and rehabilitating them on the north end of the bridge. A number of broken wires were discovered. As a result, Piasecki unwrapped four cables on the south side to compare them with the north side cables. The south side cables appeared no worse than the north side cables.

[¶ 6] Based on the condition of the cables, the need for additional structural work, and the anticipated cost of repair, DOT began to consider erection of a new bridge. In the spring of 2003, DOT determined, for safety and financial reasons, to replace the bridge. DOT had to continue to rehabilitate the existing bridge to ensure its safety while the new bridge was planned, permitted, designed, and built. Piasecki reported to DOT, in June 2003, that the south side cables were in worse condition than the north side cables. This prompted DOT to expedite the schedule for replacing the bridge.

---

1. The Dyers also argue that the Superior Court abused its discretion in prohibiting them from questioning DOT employees regarding their mental processes. Parties are not permitted to inquire about the mental processes of administrative decision-makers unless there is a "strong showing of bad faith or improper behavior." *Frye v. Inhabitants of Town of Cumberland*, 464 A.2d 195, 200 (Me. 1983) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The Dyers failed to make the requisite showing here, thus the court did not abuse its discretion. Furthermore, the Dyers failed to demonstrate that such an inquiry would "yield evidence beyond that in the record." *Frye*, 464 A.2d at 200. In addition, they were permitted to depose Deputy Commissioner Bruce Van Note, who responded to questions regarding DOT's reasons for taking the disputed land. Van Note had considerable first-hand knowledge of the decision-making process regarding replacement of the bridge.

2. As indicated by footnote one of the Superior Court's judgment, the parties failed to cooperate and agree to many of the material facts. The Dyers failed to submit any facts supported by record citations to contradict those submitted by DOT; instead, their objections to DOT's statement of material facts were based only on foundational and relevancy issues. However, even the Dyers' arguments to us do not establish any disputes as to material facts essential to the resolution of this appeal.

[¶ 7] Parsons continued to monitor the structural integrity of the bridge. On July 11, 2003, a Parsons representative made an urgent call to DOT, reporting that the south side cables were worse than expected and advising immediate posting of the bridge. DOT then banned all vehicles weighing twelve tons or more from the bridge. Vehicles exceeding the posted weight were detoured forty miles through Bangor. DOT also directed technicians and engineers to monitor the southern cables around the clock to check for additional breaks.

[¶ 8] Due to this exigency, DOT determined that the new bridge would be a fast-track project using the "design-build" process, *i.e.,* actual construction would begin before the entire project was designed. The new bridge was planned to be located adjacent to the existing bridge. As a result, DOT exercised its eminent domain powers pursuant to 23 M.R.S. § 153–B(1) (2007) to take the Dyers' property. The initial takings document set a price of $225,000 to be paid for the property. On appeal to the State Claims Commission, the amount of the award to the Dyers was increased to $470,000. That award is subject to a separate appeal by the Dyers, not part of this proceeding.

[¶ 9] In September of 2005, two years after DOT acquired the property, the Dyers filed a complaint with the Superior Court challenging the legality of the taking. The Dyers did not, and do not, dispute that there was a need to construct a new bridge or that a portion of their property was required for a valid public purpose; they only assert that a taking of all five acres was not necessary to the project. The Dyers contend that DOT took all of their land because it did not want the restaurant operating at that location. They assert that four acres of their land was never utilized in the construction pro-

cess and that the restaurant was not demolished until just prior to the opening of the new bridge, as proof that this land was not needed.

[¶ 10] The DOT agrees that it did not want the restaurant operating at the location. DOT supported its position with a statement of material facts demonstrating, with requisite record citations, that the location presented a traffic hazard because it was immediately south of the curve in the highway where it enters the bridge, and restaurant traffic would enter and exit the highway immediately after the curve. In addition to traffic safety concerns, DOT did not want a restaurant operating on the premises and required a complete taking of the property because: (1) land beyond the one acre used for the highway expansion was used during construction for staging and for filling with rocks derived from blasting to create the new right of way; (2) the project required "severe blasting" across from the restaurant, which created a public safety risk in the area; (3) DOT already owned most of the land in front of the restaurant and its parking lot; and (4) DOT was operating under time constraints and needed flexibility for designing the bridge and associated roadways as it was built, in order to avoid construction delays.

[¶ 11] In January 2007, DOT filed a motion for summary judgment, which the Superior Court granted in July 2007. The court held that questions of exigency for a taking are political and thus will not be set aside unless no rational basis exists for finding an exigency. The court stated that a taking will be reversed only if the record supports a finding that the agency abused its power. The court indicated that the fact that the restaurant remained during construction was "not inconsistent with" DOT's rationale. Thus, the court found that the Dyers failed to raise a genuine issue of material fact regarding DOT's ex-

ercise of its eminent domain power. As a result, the court granted DOT's motion for summary judgment.

[¶ 12] In a footnote, the court noted that the Dyers' responses to DOT's statements of material fact did not comply with the requirements of M.R. Civ. P. 56(h). The court indicated that the Dyers "objected even to the ownership, location, and size of the property," facts which were not in controversy. Further, the Dyers objected to "matters taken directly from their complaint to provide background for the motions." The Dyers also objected to the relevancy of statements providing essential background regarding the existence of an exigency and the reasons for the design and build process being expedited.

[¶ 13] The Dyers filed this appeal.

## II. LEGAL ANALYSIS

[¶ 14] We review grants of summary judgment de novo, taking the evidence in the light most favorable to the party against whom judgment was entered. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174. Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence indicates no genuine issue of material fact that is in dispute, and, accordingly, the moving party is entitled to judgment as a matter of law. *Id.* (citing *Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶ 18, 834 A.2d 947, 952–53). A material fact is one that can affect the outcome of the case. *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 9, 878 A.2d 504, 507. A genuine issue of material fact exists when the factfinder must "choose between competing versions of the truth." *Id.*; *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040, 1044. Summary judgment is appropriate even when "concepts such as motive or intent are at issue, ... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."[3] *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir.2007) (quoting *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003)) (internal citations omitted).

[¶ 15] "A party's opposing statement of material facts must explicitly admit, deny, or qualify facts by reference to each numbered paragraph, and a denial or qualification must be supported by a record citation."[4] *Stanley*, 2004 ME 157, ¶ 13, 864 A.2d at 174 (quotation marks omitted). Failure to properly respond to a statement of material facts permits a court to deem admitted any statements not

---

3. The test is not whether some "metaphysical" dispute exists, but whether the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, if not, "there is no 'genuine issue for trial.'" *Scott v. Harris*, — U.S. —, —, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

4. Responding to the DOT statement of material facts, the Dyers admitted only five paragraphs, objected to forty-two, denied ten, and qualified six. In doing this, they failed to provide any record citation for their statements. Furthermore, they did not contradict any facts, other than asserting that the entire property was not needed for construction of the bridge. The Dyers did submit an "Additional Statement of Material Facts," which does contain record citations. The record citations are predominantly to Paul Dyer's affidavit which provides no basis other than his own bald accusations for his opinion that the entire five acres was not necessary, or that the State took the land because it did not want the Dyers' business to operate. The deposition of DOT Deputy Commissioner Bruce Van Note, which Dyer cites, supports DOT's statement that taking the entire property was necessary because DOT was unsure of what lands would be used, additional lands were used in staging, and there were traffic and public safety concerns.

properly denied or controverted.[5] *Id.* (citing M.R. Civ. P. 56(h)(4)). Here, where the Dyers failed to properly respond to the DOT statement of material facts, the Superior Court could have deemed DOT's statements of material fact admitted and granted summary judgment. *See Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 7–8 (1st Cir.2007).

[¶ 16] The summary judgment practice reflected in the record of this case, where there were few material facts potentially in dispute, suggests that we need to remind litigants that the requirements of M.R. Civ. P. 56(h) must be respected and will be enforced.

 [¶ 17] Pursuant to 23 M.R.S. § 153–B(1) (2007), DOT's power to take private property for bridge construction is limited to only the land "necessary" for that construction. The Dyers agree that judicial review of DOT takings is limited, but argue it should be undertaken when an agency acts in "bad faith or through an abuse of power." The Dyers assert that in order to withstand summary judgment, all that was necessary was that they present an opinion that DOT abused its power or acted in bad faith. The Dyers argue they met this standard by alleging that only one-fifth of the land taken was used and that the restaurant building remained until after completion of construction.

[¶ 18] Article I, section 21 of the Maine Constitution provides that "[p]rivate property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Title 23 M.R.S. § 153–B(1) is a broad grant of legislative power that supports takings. It provides in relevant part:

ACQUISITION OF PROPERTY. The Department of Transportation, on behalf of the State, may take over and hold for the State such property as it determines necessary to:

A. Lay out and establish, construct, improve or maintain, provide a change of location or alignment of or provide drainage for state and state aid highways;

. . . .

C. Provide for the health, safety and welfare of the public using a state or state aid highway;

D. Secure materials, with necessary ways and access, for the construction, improvement and maintenance of state and state aid highways; . . .

 [¶ 19] We have previously stated that the Legislature's grant of power to determine the "suitability of the property for the particular public use" is political in nature; and that the political determination includes the "extent to which the property must be taken to satisfy the exigency." *Finks v. Maine State Highway Comm'n,* 328 A.2d 791, 797 (Me. 1974); *In re Bangor Hydro–Electric Co.,* 314 A.2d 800, 803 (Me.1974). As a result,

---

**5.** The Dyers objected to paragraphs 9–33, 35–51, and 57–59 on the basis that the information provided was irrelevant, but did not contradict the statements made in those paragraphs. This information is in fact relevant, as it provides context for the taking, DOT's decision to fast-track the project, and its reasons for acquiring all five acres. Furthermore, such objections belong in the party's memorandum of law, not its statement of material facts. *See* Advisory Committee Notes to the 2007 amendments to M.R. Civ. P. 56. Additionally, the information contained in paragraphs 5–15, is public knowledge, and thus the Dyers' objections to those paragraphs are without merit and the court could take judicial notice of those facts. M.R. Evid. 201(b), (c). The Dyer's only real dispute with the facts is whether all five acres were "necessary." The only basis for this allegation is Paul Dyer's conclusory affidavit, unsupported by any facts or demonstrated expertise to counter the DOT fact statements. *See* M.R. Evid. 602, 701, 702.

we review a finding of public exigency pursuant to article I, § 21 only to determine whether there was a "rational basis to support a finding that an exigency existed." *Fuller v. Town of Searsport*, 543 A.2d 361, 363 (Me.1988) (citing *Ace Ambulance Serv. v. City of Augusta*, 337 A.2d 661, 663 (Me.1975)). There is "no constitutional right on the part of the land owner to have the question of the necessity of the taking [including the extent thereof] submitted to a court" except to resolve whether the "determination of the necessity ... [was] made in bad faith or through an abuse of power." *Finks*, 328 A.2d at 797. An abuse of power occurs when the agency uses its power in an extravagant manner, employs it contrary to the law of its use, or uses it improperly and to excess. *Id.* at 798.

[¶ 20] The Dyers do not challenge the fact that the property was taken for a public use, or that a public exigency existed. They merely challenge DOT's determination that all five acres were necessary to satisfy the exigency. An owner's opinion that DOT'S taking was greater than necessary is not, by itself, sufficient to create a dispute as to the material fact that there has been bad faith or an abuse of power. Our review is limited to whether there was a rational basis for DOT to determine that an exigency existed and whether DOT abused its power or acted in bad faith. *See Fuller*, 543 A.2d at 363; *Finks*, 328 A.2d at 797.

[¶ 21] The issues in our review are factual, but the Dyers failed to present any evidence, other than personal opinion, contradicting DOT's statements that taking the full five acres was necessary. The Dyers do not contest that the design of the bridge was not completed at the time the land was taken or that traffic safety concerns existed.[6] Rather than present evidence contradicting DOT's reasons for taking their property, the Dyers merely assert that DOT acted inappropriately in order to terminate their lawful business, without any evidence to support this accusation, other than their own bald assertions. Without a basis for these statements or evidence contradicting DOT's reasoned statements as to why it took all five acres, there are no genuine issues of material fact in dispute.[7] DOT had a rational basis for determining that taking all of the property was necessary because of exigencies, and there is no evidence upon which a fact-finder could base a finding

---

**6.** The Dyers argue DOT knew what land was necessary by November 4, 2003, however, they rely on Van Note's deposition to support their contention. Van Note testified that among the reasons DOT took all five acres were traffic safety concerns. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S.Ct. at 1776. Here, the record "blatantly" contradicts the Dyers' assertions.

**7.** The United States Supreme Court has held, "that the mere existence *of some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party may not rest upon mere denials, but must set forth "specific facts showing that there is a genuine issue for trial." *Id.* at 250, 106 S.Ct. 2505. The Court went on to state if evidence is merely "colorable" or is "not significantly probative" then summary judgment is appropriate. *Id.* at 249–50, 106 S.Ct. 2505. No longer is the test whether there is even a scintilla of evidence or "literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it." *Id.* at 251, 106 S.Ct. 2505 (quotation marks omitted).

that DOT acted in bad faith or abused its power. Therefore, summary judgment was appropriate.

The entry is:

Judgment affirmed.