STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-17-339

KATHLEEN WAUGH, )
)
Plaintiff )
)
v. )
)
GENESIS HEALTHCARE LLC and )
WESTBROOK OPERATIONS d/b/a )
SPRINGBROOK CENTER, )
)
Defendants. )

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

STATE OF MAINE
Cumberland ss Clerk's Office

DEC 1 ° 2018 4:03

RECEIVED ᵖᵐ

Before the Court is Defendants' motion for summary judgment. The parties have fully briefed the issue, and this motion is in order for decision. For the following reasons, Defendants' motion is granted.

I. Background

The following facts are drawn from the parties' statements of material facts and are not in dispute.[1] Plaintiff is an experienced nurse, having been involved in health care since high school. (Pl.'s S.M.F. ¶ 1.) She began as a certified nursing assistant (CNA) before obtaining her nursing degree and license in 2002. (*Id.* ¶ 2.) She worked for many years as a nurse in long-term care before becoming a traveling nurse working temporary assignments at different health care facilities. (*Id.* ¶ 3.) She worked as a Registered Nurse for a staffing agency, Core Medical Group ("Core"), from April 2015 through August 2016. (Defs.' S.M.F. ¶ 5.) In January 2016, Core placed

---

[1] The Court finds it necessary to remind counsel for all parties of the requirements of M.R. Civ. P. 56(h): Supporting and opposing statements of material facts shall be "separate, short, and concise," and each fact asserted "shall be set forth in a separately numbered paragraph." M.R. Civ. P. 56(h)(1), (2).

Moreover, a "material fact is one that can affect the outcome of the case." *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. In particular, Plaintiff's opposing statement of material facts includes a litany of irrelevant facts regarding staff members who are not Plaintiff, residents who are not the resident at issue in this case, and events that occurred when Plaintiff was not working at Springbrook.

**Plaintiff–Guy Loranger, Esq.
Defendants–James Erwin, Esq.**

Plaintiff on assignment at Springbrook Center ("Springbrook") in Westbrook, Maine, from January 25, 2016 through August 6, 2016. (*Id.* ¶¶ 6-7.)

Following the Fourth of July weekend in 2016, Plaintiff sent an email to her handler at Core reporting "a pretty unsafe situation" at Springbrook. (Pl.'s S.M.F. ¶ 55.) Her handler in turn emailed Catherine Hesenius of Genesis Healthcare ("Genesis")[2] requesting that someone look into Plaintiff's reports of feeling unsafe. (*Id.* ¶ 56.)[3] Plaintiff also reported her concerns to Nurse Deborah Bostic, who reported to Hesenius that she followed up with Plaintiff and there may have been a communication breakdown. (*Id.* ¶¶ 60-61; Defs.' Reply to Pl.'s S.M.F. ¶¶ 60-61; Bostic Dep. Ex. 1.)

On the night of July 29, 2016, while Plaintiff was on duty, a Springbook resident persistently rang his call bell. (Pl.'s S.M.F. ¶¶ 64-65; Defs.' S.M.F. ¶ 9.) On July 30, the resident complained to Registered Nurse Molly McIntire that on July 29, Plaintiff had removed the resident's call bell.[4] (Defs.' S.M.F. ¶ 9.) McIntire's report, which Plaintiff concedes is an accurate report of the resident's complaint, states:

> Resident states nurse "Kathy" came in and "ripped the call bell off my shirt" states she placed bell out of reach stating "how do you like that" Resident states he was told he could no longer use the call bell as reported to him, he was using too much. Resident denied to writer he had any increase needs at this time then typically. He states the nurse told him staff would check on him Q30 mins.

---

[2] The parties disagree on Genesis's relationship to Springbrook. Defendants contend Genesis is merely a holding company that "has no employees, owns no property, operates no facilities, and conducts no business beyond holding the membership shares of Genesis Holdings LLC, SHG Partnership, LLC and Skilled Healthcare, LLC." (Defs.' S.M.F. ¶¶ 2-3.) Plaintiff states Springbrook is a subsidiary of Genesis, and several witnesses in this case were Genesis employees. (Pl.'s S.M.F. ¶ 7; Pl.'s Opp'n to Defs.' S.M.F. ¶¶ 2-3.)

[3] Defendant objects to these emails as inadmissible hearsay. The Court finds they are admissible not to prove the fact asserted within them – that Springbrook was unsafe – but to show that Plaintiff reported her concerns to Core, who relayed those concerns to Genesis.

[4] For clarification, Plaintiff admits the resident made this allegation, but denies the substance of the allegation. (*See* Pl.'s Resp. to Defs.' S.M.F. ¶ 9.)

(*Id.* ¶¶ 10-11.) In a later interview, the resident stated that Plaintiff also "coiled [the call bell] up and threw it behind me." (Pl.'s S.M.F. ¶ 87.) In another interview, the resident asserted that a CNA put the call bell back in his reach and said: "Don't tell them I put it back." (*Id.* ¶ 90.)

Defendants investigated the incident, including the involvement of Plaintiff and Shaun Riley, the supervising nurse on duty that evening who spoke with the resident after his interaction with Plaintiff. (Defs.' S.M.F. ¶ 12.) Riley wrote in her statement, "Pt. had his call bell in hand when I arrived." (Pl.'s S.M.F. ¶ 92.) Statements were also taken from two CNAs, Linda Richard and Isabelle Grimaldi, who were on duty with Plaintiff the evening of July 29. (Defs.' S.M.F. ¶ 13.) Richard confirmed that the resident rang his bell "quite a bit" that evening, but did not recall that he was ever without his call bell. (*Id.* ¶ 14.)[5] Grimaldi testified that Riley spoke to the resident about his use of his call bell. (*Id.* ¶¶ 17-20.) Grimaldi stated she was not aware that the resident was ever without his call bell that evening, but the resident told Grimaldi that somebody had taken away his call bell. (*Id.* ¶¶ 22-23.) Grimaldi also explained that the resident at times would inadvertently unplug the call bell and that "the bell at one time was unplugged from the wall and the patient had the other end." (Pl.'s S.M.F. ¶¶ 97-98.)

On August 1, 2016, Director of Nursing Deborah Bostic and Clinical Quality Specialist Sharon Emerson decided not to allow Plaintiff to continue working during the investigation because, among other things, she had been accused of violating Genesis's policy requiring residents to have call bells at all times. (Defs.' S.M.F. ¶ 27.) That same day, Emerson called Core and stated that there had been an allegation against Plaintiff, that Springbrook was investigating, and that Plaintiff should not return to work until the investigation had been completed. (*Id.*) Bostic

---

[5] Plaintiff qualifies this statement by noting Richard's statement also states, "I make sure they have the call bell." (Pl.'s Resp. to Defs.' S.M.F. ¶ 14.)

and Emerson interviewed Plaintiff on August 1 and informed her that she was suspended pending the outcome of Springbrook's investigation. (*Id.* ¶ 28.)

After the August 1 meeting, Plaintiff called her contact at Core, Ted Maravelias, who told her that he knew nothing about the situation, that "these things take time," and that she should let Springbrook perform its investigation. (*Id.* ¶ 30.) Following its investigation, Springbrook decided to terminate Plaintiff. (*Id.* ¶ 35.) On August 3, 2016, Emerson and Bostic informed Plaintiff her services were no longer needed and notified Catherine Hesenius, of the decision. (*Id.* ¶ 38.) After Plaintiff informed Maravelias of that conversation, Maravelias told Plaintiff that his manager would not allow him to give Plaintiff any more assignments if she had been terminated from her contract. (*Id.* ¶¶ 39-40.)

Bostic and Emerson recommended to Denise Williams, the Springbrook Center-Genesis Healthcare Human Resources Director, that Plaintiff be terminated. (Pl.'s S.M.F. ¶ 107; Defs.' Reply to Pl.'s S.M.F. ¶ 107.) On August 3, Williams emailed Stephanie Burrows, Genesis's Regional Human Resource Manager, to request approval to terminate Plaintiff's contract. (Pl.'s S.M.F. ¶ 108.) Burrows responded, "from what I could read, it sounds like Kathy is saying she did not take the call bell away and knows she cannot do that." (*Id.* ¶ 109.) Williams answered, "Kathy denies taking the call bell away, but this is not supported by CNA and resident's interviews." (*Id.* ¶ 110.) Burrows responded, "if the investigation has been completed and Deb and Sharon are confident the allegation of abuse is founded, then yes, I support the termination." (*Id.* ¶ 116.) Williams answered, "Thank you. Yes, a five day follow up with the State is being done stating the allegation was founded." (*Id.* ¶ 117.) On August 5, Bostic submitted the five-day follow up report to DHHS. (*Id.* ¶ 153.) In this report, under the "Conclusions" headings, Bostic checked off the "Allegation Substantiated" and "Allegation of misconduct Substantiated" boxes. (*Id.* ¶¶ 135, 136.)

Bostic also completed a form that was sent to Core, stating the results of the investigation and alerting Core that it should contact the Board of Nursing. (Defs.' S.M.F. ¶ 42.) The document, entitled "Travel Employee Performance Counsel Notice," states: "pt alleges neglect and informed DHHS" and "It is up to Core Medical to report to BORN." (*Id.* ¶ 43.) She attached the five-day follow up DHHS report to this Notice. (Pl.'s S.M.F. ¶ 129; Def.'s Reply to Pl.'s S.M.F. ¶ 129.)

On August 19, 2016, Core filed a complaint with the Board of Nursing against Plaintiff. (Pl.'s S.M.F. ¶ 145.) Core's complaint states, "The facility conducted an investigation and concluded that [Plaintiff] was neglectful and violated the patient's rights by taking the bell away." (*Id.* ¶ 147.) Core attached the Travel Employee Performance Counsel Notice to the complaint. (*Id.* ¶ 148.) Springbrook also sent a copy of its investigation materials to the Board of Nursing, at the Board's request, on August 31. (Defs.' S.M.F. ¶ 47.) The Board conducted an inquiry, and on December 13, 2016, Plaintiff was notified that no violation of the law regulating the practice of nursing had been found, resulting in no impact to Plaintiff's nursing license. (*Id.* ¶ 48.)

At her deposition, Bostic testified that her notes of her investigation did not provide that any health care worker at Springbrook was able to corroborate or verify that Plaintiff took the call bell. (Pl.'s S.M.F. ¶ 101.) She further testified that the phrase "Kathy denies taking the call bell away, but this is not supported by the CNAs" is not an accurate statement.[6] (*Id.* ¶ 115). She also testified that the allegation of Plaintiff taking the resident's call bell away "was not substantiated by anybody working that night." (*Id.* ¶ 132.) Williams similarly acknowledged at her deposition that Richard's and Grimaldi's statements do not include a statement about Plaintiff taking the call bell from the resident. (*Id.* ¶¶ 103-04; Defs.' Reply to Pl.'s S.M.F. ¶¶ 103-04.)

---

[6] Defendants qualify this statement by noting "No CNAs saw [Plaintiff] taking the call bell away, but the resident consistently stated that [Plaintiff] did." (Defs.' Reply to Pl.'s S.M.F. ¶ 115.)

Plaintiff filed her Complaint with this Court on September 5, 2017, alleging claims for defamation (Count I), slander/libel per se (Count II), and interference with advantageous economic relations (Count III). Count III was dismissed on November 14, 2017.

## II. Standard of Review

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the factfinder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

If the moving party's motion for summary judgment is properly supported, the burden then shifts to the non-moving party to respond with specific facts indicating a genuine issue for trial in order to avoid summary judgment. M.R. Civ. P. 56(e). When a defendant moves for summary judgment, the plaintiff must respond with evidence establishing a prima facie case. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. The evidence proffered by the plaintiff "need not be persuasive at that stage, but the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759. If a plaintiff fails to present sufficient evidence, then the defendant is entitled to a summary judgment. *Watt*, 2009 ME 47, ¶ 21, 969 A.2d 897.

## III. Discussion

Plaintiff alleges four defamatory statements were made by Defendants:

(1) The August 3, 2016 internal email from Williams to Burrows;

(2) Bostic's Travel Employee Counsel Notice;

(3) Core Medical's complaint to the Board of Nursing which republished Bostic's submission to DHHS; and

(4) Defendants' submission to DHHS.[7]

(Pl.'s Opp'n to Mot. Summ. J. 14.) A claim for defamation requires evidence of:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991) (citing *Restatement (Second) of Torts* § 558 (1977)). Defendants challenge aspects of three elements of Plaintiff's defamation claim: falsity of the statements, absence of privilege, and fault amounting to at least negligence. The parties' arguments focus principally on privilege, and the Court finds the privilege issue is dispositive of this motion.

Defendants argue, and Plaintiff does not dispute, that the alleged defamatory statements are subject to conditional or statutory privileges. An otherwise defamatory statement is "conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." *Restatement (Second) of Torts* § 596; *see Lester*, 596 A.2d at 70 (adopting *Restatement* approach to determine existence of circumstances giving rise to conditional privilege). "[S]tatements made in the course of an investigation into an employee's actions for disciplinary purposes are conditionally privileged."

---

[7] Plaintiff's Complaint is far from clear as to the contents of the statements she alleges were defamatory. Her opposition to this motion provides more specificity but is still not entirely transparent. From the record, the Court distills that the statements at issue are Williams's statement that "Kathy denies taking the call bell away, but this is not supported by CNA and resident's interviews" and Bostic's assertion of Plaintiff's misconduct, by checking boxes stating "Allegation Substantiated" and "Allegation of misconduct Substantiated," in her DHHS report (which was republished to Core and the Board of Nursing). To the extent Plaintiff alleges any other statements made by Defendants were defamatory, the Court nonetheless finds no evidence in the record of abuse of privilege.

*Morgan v. Kooistra*, 2008 ME 26, ¶ 35, 941 A.2d 447. Here, statements between Springbrook and Genesis and between Springbrook and Core are subject to a conditional privilege.

The reports to DHHS and the Board of Nursing are subject to statutory immunity. *See* 22 M.R.S. § 3479-A (providing civil immunity to "a person participating in good faith in reporting" of suspected abuse pursuant to 22 M.R.S. §§ 3477 and 3479); 24 M.R.S. § 2511 (providing civil immunity to health care providers and health care entities for "making any report or other information available to any board ... pursuant to law," including as required by 24 M.R.S. § 2506).

"Once a defendant proves entitlement to the privilege, the burden shifts to the plaintiff to come forward with evidence that could go to the jury that the defendant abused the privilege."[8] *Morgan*, 2008 ME 26, ¶ 34, 941 A.2d 447 (internal quotation marks and alterations omitted). Whether a privilege was abused is a question of fact. *Id.* A privilege is abused when one makes a statement "knowing it is false, with a reckless disregard for its truth, or acting out of spite or ill will." *Id.* A reckless disregard for the truth exists when the speaker "had a high degree of awareness of the probable falsity or serious doubt as to the truth of the statement." *Id.* (internal quotation marks omitted). Importantly,

> [k]nowledge or disregard of falsity is a purely subjective state of mind. [T]here must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication*. Evidence that some of [the defendant's] factual premises were objectively false, or even that no reasonable person could have believed them to be true, does not show that she knew or disregarded their falsity.

---

[8] The parties' arguments assume the statutory privileges are subject to the same abuse-of-privilege analysis as conditional privilege. The Court notes that reports to DHHS are privileged for persons reporting in *good faith* and that there is a rebuttable presumption of good faith. 22 M.R.S. § 3479-A. In proper circumstances, the Maine Health Security Act provides immunity to "[a]ny person acting without malice" and provides absolute immunity to, *inter alia*, health care providers and health care entities. 24 M.R.S. § 2511; *see Argereow v. Weisberg*, 2018 ME 140, ¶ 21, __ A.3d __. However, under any analysis, the Court finds no evidence that the statements alleged by Plaintiff to be defamatory are not privileged.

*Lester*, 596 A.2d at 71 (internal citations and quotations omitted) (emphasis in original).

The Court concludes Plaintiff has not proferred sufficient evidence of knowledge, recklessness, or spite or ill will to overcome summary judgment. Plaintiff generally argues that because Defendants' agents now acknowledge none of the CNAs' statements say Plaintiff took the resident's call bell, Defendants must have made their reports with knowledge or reckless disregard of the truth that the staff statements did not support the resident's allegation. In so arguing, Plaintiff seems to conflate knowledge or recklessness with the falsity element of defamation, contending for example, "In fact, the record contains absolutely no evidence to support Bostic's representation that the investigation substantiated that Waugh took the call bell from the resident. ... Based on the record, a trier of fact could reasonably infer that Bostic knew that her subject assertion was false." (Pl.'s Opp'n to Mot. Summ. J. 15.) In support of its contention that Bostic made her statements with reckless disregard of the truth, Plaintiff lists a number of facts that "call[] into question the veracity of the allegation" and notes the Board of Nursing found Plaintiff did not violate the law regulating the practice of nursing. (*Id.* at 15-16.)

Plaintiff essentially takes the position that because the statements were (allegedly) false, Defendants knew they were false or acted with reckless disregard of their truth or falsity. The record, however, is entirely without evidence of Bostic's subjective state of mind when she made the subject statements. To the contrary, the record contains evidence that Bostic believed her statements to be true. She testified at her deposition that she found the allegations were substantiated due to "[t]he resident['s] credibility." (Bostic Dep. 45:1-5.) There is room for dispute as to whether the statements Bostic made were accurate or whether her conclusions were justified, but Plaintiff has put forth no evidence whatsoever either that Bostic knew her statements were false or that she had serious doubts about their truth.

The same can be said for Williams's email to Burrows at Genesis. At her deposition, when asked "Did you actually read the statements from the CNAs?" and "And you believe that the statements say that Waugh took away the call bell?" Williams replied "Yes" to both questions. (Williams Dep. 23:18-22.) Williams did acknowledge that the CNAs' statements do not in fact say Plaintiff took away the call bell. (*Id.* 27:5-19.) However, she also confirmed that Nurse McIntyre's statement from the resident says Plaintiff took the call bell, and Unit Manager Tara Bucknell's statement says the resident said Plaintiff took his call bell. (*Id.* 29:11-25.) Williams then testified that she relied on these interviews when she made her statement to Burrows. (*Id.* 30:6-12.) This testimony perhaps raises an inference, unrebutted by Plaintiff, that Williams was merely mistaken about who said Plaintiff took the call bell; there is no evidence that she was any more than negligent when she said the CNA interviews did not support Plaintiff's denial of the resident's allegation. While negligence is an element of defamation, a plaintiff must show more than negligence when a statement is protected by a conditional privilege. As with Bostic, there is simply no evidence in the record that Williams subjectively knew her statement was false or that she had serious doubts about its truth.

Furthermore, there is no evidence in the record that any of Defendants' agents acted out of spite or ill will toward Plaintiff. Plaintiff goes to great lengths to attempt to support a theory that, due to Plaintiff's complaints about understaffing and substandard care at Springbrook, Bostic harbored ill will toward Plaintiff and acted out of a retaliatory motive in defaming Plaintiff. Plaintiff argues in conclusory fashion, "Given the evidence of Bostic falsely and recklessly claiming her investigation corroborated the complaint against Waugh, and Waugh's recent complaint about understaffing and unsafe conditions reaching corporate, a trier of fact cold [*sic*] reasonably infer that Bostic acted out of spite in allegedly concluding that Waugh take [*sic*] the

resident's call bell." (Pl.'s Opp'n to Mot. Summ. J. 16-17.) Any connection between Plaintiff's complaints and Bostic's alleged defamatory statements is entirely speculative and wholly insufficient to support an inference that Bostic acted out of spite or ill will. *See Estate of Smith*, 2013 ME 13, ¶ 19, 60 A.3d 759 (summary judgment evidence "must be sufficient to allow a fact-finder to make a factual determination without speculating").

In sum, Plaintiff has failed to put forth sufficient evidence that Defendants abused or otherwise lost their privileges. As such, Plaintiff has not demonstrated that any of the statements alleged to be defamatory are not privileged, and she therefore cannot support her claim for defamation.

While the parties' filings give minimal attention to Count II of Plaintiff's Complaint, the claim for "slander/libel per se," the Court finds that this Count fails for the same reasons as the defamation claim.

IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. Judgment is hereby entered for Defendants. *Defendants are awarded costs.*

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: Dec. 18, 2018

Justice
Maine Superior Court
**A.M. Horton**

Entered on the Docket: 12/19/18 me

11 of 11