STATE OF MAINE  
ANDROSCOGGIN, ss.

SUPERIOR COURT  
CIVIL ACTION  
DOCKET NO. CV-17-180

MICHAEL BELL,

)
)
)

FEB 14 '19 AM 10:06  
ANDRO SUPERIOR COURT

      Plaintiff

)
)

v.

)
)

ORDER ON DEFENDANT'S  
MOTION FOR SUMMARY  
JUDGMENT

REED & REED, INC.,

)
)
)

      Defendant.

)
)
)

Before the Court is Defendant Reed & Reed, Inc.'s motion for summary judgment. Reed & Reed contends it is entitled to summary judgment on Plaintiff Michael Bell's claim for disability discrimination. Mr. Bell has not filed an opposition to the motion.[1] For the following reasons, the motion is granted.

I. Background

The following facts are drawn from Reed & Reed's statement of material facts and are properly supported by record citations. Because Mr. Bell has failed to file an opposing statement of material facts, these facts are deemed admitted. M.R. Civ. P. 56(h)(4).

Reed & Reed is a general contractor with headquarters in Woolwich, Maine. (Def.'s S.M.F. ¶ 1.) Mr. Bell worked as a crane operator for Reed & Reed from June 30, 2014 until his termination on May 17, 2016. (Def.'s S.M.F. ¶ 2.) At all times relevant to Mr. Bell's employment, Reed & Reed was the general contractor for the construction of fifty-six wind towers on mountaintops near Bingham, Maine. (Def.'s S.M.F. ¶ 3.) The construction of these windmills, with 300-foot towers and 182-foot blades, is complex, requiring crews to operate heavy machinery in a remote, mountainous environment. (Def.'s S.M.F. ¶ 4.)

---

[1] Rather than file a memorandum in opposition, opposing affidavits, and opposing statements of material fact, as required by M.R. Civ. P. 7(c)(2) and 56(e) and (h)(2), on November 29, 2018, Mr. Bell instead filed a letter with the Court containing nothing more than *ad hominem* attacks on the presiding Justice and Mr. Bell's former counsel. The Court finds this filing wholly fails to satisfy the requirements of M.R. Civ. P. 7(c) and 56.

Mr. Bell's duties as a crane operator included moving large and heavy components on his crane's hook while crews often worked under the crane to position equipment and materials on the jobsite. (Def.'s S.M.F. ¶ 13.)

At all relevant times, Robin Wood worked as the Human Resources Director for Reed & Reed, and Charles Seavey worked as a Supervisor for Reed & Reed. (Def.'s S.M.F. ¶¶ 5-6.) Mr. Seavey supervised Mr. Bell while working at the Reed & Reed Saddleback Mountain and Jericho wind project sites in 2014 and 2015. (Def.'s S.M.F. ¶ 9.) At all relevant times, Daniel Deschenes worked as a Foreman for Reed & Reed, and Gregory Letourneau worked as a Senior Supervisor for Reed & Reed. (Def.'s S.M.F. ¶¶ 7-8.) At the Bingham worksite, Mr. Bell reported to Mr. Deschenes, who in turn reported to Mr. Letourneau. (Def.'s S.M.F. ¶ 10.) As a foreman, Mr. Deschenes was responsible for conducting and overseeing work with a crew of approximately a half dozen workers. He was responsible for overseeing the crew's scheduling, work production, and that they were performing safely and according to company policy. (Def.'s S.M.F. ¶ 11.)

As part of the new employee onboarding process, Reed & Reed provided Mr. Bell with orientation, instruction, and written information concerning company practices and policies. (Def.'s S.M.F. ¶ 15.) Mr. Bell acknowledged his receipt, review, and understanding of Reed & Reed's written instruction, policies, and procedures identified in Reed & Reed's New Employee Checklist, which he signed. (Def.'s S.M.F. ¶ 16.) Among the policies and procedures Mr. Bell acknowledged receiving and understanding were health and safety materials concerning "Company Safety Goals," "Crane Safety," and "Personal Protective Equipment." (Def.'s S.M.F. ¶ 17.) Reed & Reed also provided Mr. Bell with its employee handbook. (Def.'s S.M.F. ¶ 18.) On June 30, 2014, Reed & Reed provided Mr. Bell with its Employee Safety Responsibilities policy, which he signed. (Def.'s S.M.F. ¶ 19.) Also on June 30, Reed & Reed supplied Mr. Bell with its general safety

rules setting forth Reed & Reed's personal protective equipment policy, and Mr. Bell acknowledged receipt. (Def.'s S.M.F. ¶ 25.) Mr. Bell was aware of Reed & Reed's safety policy requiring that employees wear personal protective equipment, including chaps, eye protection, and ear protection, when operating chainsaws. (Def.'s S.M.F. ¶ 26.)

Worker safety—and the observation of established workplace safety rules—is critical and paramount in the remote, dangerous environment in which Reed & Reed performs many of its construction projects. (Def.'s S.M.F. ¶ 20.) All Reed & Reed employees are required as a condition of their employment to be aware of, observe, and comply with all company rules and policies concerning safety and to learn the approved safety practices and procedures that apply to their work. (Def.'s S.M.F. ¶ 22.) At his deposition, Mr. Bell agreed that safety is an important aspect of crane operation, that it was a critical part of his job qualifications, and an important aspect of Reed & Reed's corporate values. (Def.'s S.M.F. ¶ 24.)

Reed & Reed has a company policy that prohibits the use or possession of alcohol and/or drugs on worksites. (Def.'s S.M.F. ¶ 27.) Mr. Bell was aware that use and/or possession of alcohol on a Reed & Reed worksite was not permitted. (Def.'s S.M.F. ¶ 28.) Reed & Reed's employee handbook, which was provided to Mr. Bell, states:

> Drugs and alcohol do not belong on the jobsite, **period.** If you are under the influence of alcohol or drugs, don't come to work. If you need assistance with a drug or alcohol problem, we have an Employee Assistance Program available to you free of charge 24 hours a day.

(Def.'s S.M.F. ¶ 29.) While typically progressive in nature, Reed & Reed's disciplinary policy provides that, in some circumstances, immediate termination may result from an employee's actions. (Def.'s S.M.F. ¶ 30.) The disciplinary policy provides a partial list of the type of violations that are cause for disciplinary action up to and including termination, and those actions include "[f]ailure to follow safety rules" and "[u]se,

possession, ... impairment and being under the influence of illegal drugs or alcohol on company premises or jobsites, in company supplied vehicles or during working hours." (Def.'s S.M.F. ¶ 31.)

On August 13, 2015, Mr. Seavey received a telephone call from Mr. Bell informing him that Mr. Bell had just been released from jail, that his life was a mess, that his wife was leaving him, and that he had a drinking problem. (Def.'s S.M.F. ¶ 34.) Mr. Seavey convinced Mr. Bell to call Reed & Reed's Employee Assistance Program (EAP). (Def.'s S.M.F. ¶ 35.) The EAP is a confidential employee benefit for Reed & Reed employees; it is available without referral to all employees at all times. (Def.'s S.M.F. ¶ 36.) The following day, Mr. Seavey drove to the Jericho jobsite to meet with Mr. Bell, and he asked Mr. Bell if he had contacted the EAP. When Mr. Bell replied that he had not because he would have to miss time from work, Mr. Seavey assured him that it was acceptable for him to miss work if he needed to meet with the EAP counselor. (Def.'s S.M.F. ¶ 37.) On August 17, Mr. Seavey again asked Mr. Bell if he had made an appointment with the EAP representative, and Mr. Bell replied that he had scheduled an appointment for the following day. (Def.'s S.M.F. ¶ 38.) On August 24, Mr. Seavey asked Mr. Bell about his EAP meeting. Mr. Bell replied that he did not like it because the EAP staff wanted him to go too often. Mr. Seavey encouraged Mr. Bell to try to do so, and Mr. Bell said that he would. (Def.'s S.M.F. ¶ 39.) When Mr. Seavey next followed up with Mr. Bell to see if he had scheduled another EAP session, Mr. Bell said the person he saw the first time was not working for him, that it was inconvenient, and that the EAP was going to get back to him with some other counselors that would work better with his schedule. (Def.'s S.M.F. ¶ 40.) Mr. Seavey continued to follow up with Mr. Bell to encourage him to work with the EAP program to obtain what assistance he may need. (Def.'s S.M.F. ¶ 41.) At no time during this period did Mr. Bell inform Mr. Seavey that his alcohol use hindered his ability

to perform the essential functions of his job, nor did he ever request or inform Mr. Seavey that he required any accommodation in order to perform the essential functions of his job. (Def.'s S.M.F. ¶ 44.)

On May 11, 2016, Mr. Deschenes and his crew were working on the mountain at the Bingham, Maine worksite. (Def.'s S.M.F. ¶ 49.) Though he was a member of this crew, Mr. Bell was not scheduled to work that day, having requested the day off from work for personal reasons. (Def.'s S.M.F. ¶ 50.) Mr. Bell testified at his deposition that he needed to take time off to attend a court hearing on an OUI charge. (Def.'s S.M.F. ¶ 51.) After his hearing, Mr. Bell began drinking at a bar and grill in Skowhegan, Maine around noon. (Def.'s S.M.F. ¶ 52.) While at the bar, Mr. Bell drank four to six "Long Islands," a drink containing several different liquors. (Def.'s S.M.F. ¶ 53.) He then bought a bottle of vodka at a liquor store, which he drank while parked in his vehicle and while he was driving. (Def.'s S.M.F. ¶ 54.)

Mr. Bell drove to Reed & Reed's Bingham worksite, and he was under the influence of alcohol when he arrived there. (Def.'s S.M.F. ¶¶ 55-56.) Mr. Deschenes asked Mr. Bell if he was okay because he did not appear to be his usual self in that he was normally fairly quiet and reserved, but on this occasion, he was much louder and more talkative. (Def.'s S.M.F. ¶ 58.) On that date, Mr. Deschenes observed Mr. Bell operating a chainsaw at the worksite without any of the personal protective equipment that was required under Reed & Reed safety policies. (Def.'s S.M.F. ¶ 59.) Mr. Bell admitted that on May 11, 2016, he operated a chainsaw on the worksite while intoxicated and without wearing the required protective gear he knew he was required to wear. (Def.'s S.M.F. ¶ 61.) Subsequently, Mr. Bell passed out in his truck, where he stayed for a few hours. (Def.'s S.M.F. ¶ 62.) Mr. Deschenes was concerned for his safety and the safety of the other crewmembers on the site because Mr. Bell was in no condition to operate a crane.

(Def.'s S.M.F. ¶ 63.) As a precaution, Mr. Deschenes locked Mr. Bell's crane and hid the keys so that he would not be able to operate it. (Def.'s S.M.F. ¶ 64.) Toward the end of the day, one of the workers shook Mr. Bell to wake him up, and Mr. Bell drove off down the mountain. (Def.'s S.M.F. ¶ 65.) Reed & Reed paid Mr. Bell for his time on the worksite that day. (Def.'s S.M.F. ¶ 66.)

Around 5:00 p.m. that day, Mr. Deschenes reported to Senior Supervisor Letourneau his belief that Mr. Bell was intoxicated or under the influence of something while at work. (Def.'s S.M.F. ¶ 68.) Mr. Letourneau, in turn, informed HR Director Robin Wood of what had transpired involving Mr. Bell's failure to follow safety requirements and his intoxication at the worksite. (Def.'s S.M.F. ¶ 69.) He also informed Ms. Wood that Mr. Deschenes's crew did not want to work "under the hook" of Mr. Bell's crane. (Def.'s S.M.F. ¶ 70.)

On May 12, 2016, Mr. Letourneau, along with Reed & Reed's Health and Safety Director, Steve Campbell, and another Reed & Reed supervisor, met with Mr. Bell when Mr. Bell arrived for work. (Def.'s S.M.F. ¶ 71.) At that meeting, Mr. Bell admitted to operating his chainsaw without protective gear and to being intoxicated while at work. (Def.'s S.M.F. ¶ 72.) In Mr. Letourneau's view, Mr. Bell's actions were serious violations of policy, and he informed Mr. Bell that he would need to refer the matter to HR for next steps. (Def.'s S.M.F. ¶¶ 73-74.) At the end of the meeting, Mr. Bell indicated that he had a problem and needed help, at which point the three supervisory employees immediately began the process of again putting Mr. Bell in touch with Reed & Reed's EAP. (Def.'s S.M.F. ¶ 75.) While Mr. Bell was resistant at first, the senior employees strongly encouraged him to contact the EAP. Mr. Bell said his phone was dead, but the senior employees obtained a phone and provided the EAP phone number to Mr. Bell. (Def.'s S.M.F. ¶ 76.)

On May 13, 2016, Ms. Wood spoke with Mr. Bell by telephone, at which time Mr. Bell again admitted that he was under the influence of alcohol while at the jobsite and that he operated a chainsaw, without personal protective equipment, while intoxicated. (Def.'s S.M.F. ¶ 78.) Because of the severity of the safety violations and his intoxication on a Reed & Reed jobsite, Ms. Wood consulted with her superiors concerning the course of action to take with respect to potential discipline, and the decision was made to terminate Mr. Bell's employment on May 17, 2016. (Def.'s S.M.F. ¶¶ 79-80.) Mr. Bell was not terminated due to his alcoholism. (Def.'s S.M.F. ¶ 82.)

A valid driver's license is an essential job requirement for the position of a crane operator as some of the crane trucks are moved around on project worksites, which can require them to be driven on public roads. (Def.'s S.M.F. ¶ 83.) The Crane Operator job requirements expressly state that among the "Minimum Qualification Requirements" are a "Valid drivers license and ability to obtain additional licenses as required for the job." (Def.'s S.M.F. ¶ 84.) Mr. Bell was aware of his obligation to maintain a driver's license as an essential requirement of his crane operator job. (Def.'s S.M.F. ¶ 85.) Reed & Reed requires its employees to immediately notify the company of the suspension, revocation or administrative restriction of his/her operator's license. (Def.'s S.M.F. ¶¶ 86-87.) According to his driving record, Mr. Bell's driver's license was suspended in September 2015 and not reinstated until November 7, 2016. (Def.'s S.M.F. ¶ 88.) Mr. Bell testified at his deposition that his license was suspended during portions of his employment at Reed & Reed, including during the Spring of 2016, when he was terminated. (Def.'s S.M.F. ¶ 89.) Mr. Bell further testified that he intentionally failed to inform Reed & Reed of his license suspension because he did not want to lose his job. (Def.'s S.M.F. ¶ 90.) Mr. Bell's failure to have a valid driver's license rendered him unqualified to work as a crane operator for Reed & Reed. (Def.'s S.M.F. ¶ 91.) The suspension of Mr. Bell's driver's

license, along with his failure to inform the company of the suspension, would have subjected him to termination. (Def.'s S.M.F. ¶ 92.)

On June 20, 2016, prior to filing suit, Mr. Bell filed a charge of discrimination with the Maine Human Rights Commission ("MHRC"). On August 21, 2017, after consideration of the parties' submissions, the MHRC Chief Investigator found that there were no reasonable grounds to believe Reed & Reed discriminated against Mr. Bell. On September 20, 2017, the MHRC, finding no reasonable grounds to believe that unlawful discrimination occurred, dismissed Mr. Bell's complaint. (Def.'s S.M.F. ¶ 93.)

On December 18, 2017, Mr. Bell field his complaint in this Court, alleging disability discrimination under the Maine Human Rights Act, claiming his was terminated because of his alcoholism. Reed & Reed filed the present motion on November 13, 2018. As noted above, Mr. Bell filed no opposition to the motion.

## II. Standard of Review

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the factfinder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

If the moving party's motion for summary judgment is properly supported, the burden then shifts to the non-moving party to respond with specific facts indicating a genuine issue for trial in order to avoid summary judgment. M.R. Civ. P. 56(e). When a defendant moves for summary judgment, the plaintiff must respond with evidence

establishing a *prima facie* case. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. The evidence proffered by the plaintiff "need not be persuasive at that stage, but the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759. If a plaintiff fails to present sufficient evidence, then the defendant is entitled to summary judgment. *Watt*, 2009 ME 47, ¶ 21, 969 A.2d 897.

When a non-moving party fails to properly oppose a motion for summary judgment, the Court must still determine whether the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Peet v. Peet*, No. CV-04-767, 2006 Me. Super. LEXIS 131, at *6 (June 8, 2006).

III. <u>Discussion</u>

Reed & Reed argues three grounds upon which summary judgment should be granted in its favor. It first argues it had a legitimate, non-discriminatory reason to terminate Mr. Bell. It next argues Mr. Bell's claim fails because he was not in fact qualified to hold his position. Finally, it argues Reed & Reed did not fail to provide Mr. Bell with a reasonable accommodation for his disability. While the Court generally agrees that Reed & Reed is entitled to summary judgment based on each of these grounds, the undisputed fact that Mr. Bell was not qualified to hold his position is fully dispositive of this motion.

When evaluating an employment discrimination claim at the summary judgment stage, courts typically apply a three-step burden-shifting analysis. *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768. Under this analysis, the "employee must first establish a *prima facie* case that (1) he has a disability; (2) he is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of his job; and (3) his employer adversely treated him based in whole or in part on his disability." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722. If the employee

establishes *prima facie* evidence of these three elements, the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory basis for its action. *Id.* at ¶ 15. If the employer does so, the burden then shifts back to the employee to produce evidence that the employer's reason is a pretext for unlawful discrimination. *Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768.

Mr. Bell has not satisfied and, as Reed & Reed's summary judgment evidence affirmatively demonstrates, cannot satisfy his initial burden to produce *prima facie* evidence that he was qualified, with or without reasonable accommodations, to perform the essential functions of his job as a crane operator. Based on Mr. Bell's driving record from the Bureau of Motor Vehicles, Reed & Reed's affidavits, and Mr. Bell's own admissions, the record shows Mr. Bell's driver's license was suspended at the time he was terminated. The record also contains undisputed evidence that holding a valid driver's license is an essential job requirement for the crane operator position. Mr. Bell even acknowledged at his deposition that he did not inform Reed & Reed of his license suspension because he did not want to lose his job.

Moreover, the fact that Reed & Reed was not aware of the suspension of Mr. Bell's driver's license until after Mr. Bell was terminated does not negate Mr. Bell's unsatisfied burden to produce *prima facie* evidence that he was qualified for the position. Such "after-acquired" evidence may be utilized to evaluate whether, at the time of the adverse employment action, the employee was indeed qualified for the position. *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1281 (10th Cir. 1999); *Matewski v. Orkin Exterminating Co.*, No. 02-233-P-C, 2003 U.S. Dist. LEXIS, at *14 n. 14 (D. Me. July 1, 2003). The undisputed evidence in the summary judgment record shows that at the time he was terminated, Mr. Bell was not qualified to perform the essential functions of a crane operator.

Because Mr. Bell has failed to meet his burden to provide *prima facie* evidence of employment discrimination, and furthermore, because Reed & Reed has produced undisputed evidence that Mr. Bell cannot satisfy his burden to show he was qualified to perform the essential functions of his job, Mr. Bell's claim must fail as a matter of law. Reed & Reed is entitled to summary judgment in its favor.

IV. Conclusion

For the foregoing reasons, Defendant Reed & Reed, Inc.'s motion for summary judgment is GRANTED. Plaintiff Michael Bell's complaint is hereby DISMISSED WITH PREJUDICE.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: ___2/14/19___

MaryGay Kennedy, Justice
Maine Superior Court