STATE OF MAINE                                    SUPERIOR COURT
SAGADAHOC, ss.                                    CIVIL ACTION
                                                  DOCKET NO. CV-19-02

PORTLAND MUSEUM OF ART,            )
                                   )
            Plaintiff              )
                                   )
                                   )        ORDER
        v.                         )
                                   )
ANNEMARIE GERMAIN,                 )
                                   )
            Defendant.             )


After consideration of the record and the arguments of the parties, the Defendant's Motion to Dissolve Ex Parte Attachment is DENIED. The Plaintiff has established by a preponderance of the evidence that it is likely to recover a judgment in an amount equal to or greater than the amount of the attachment.

In regards to the dispute discussed with the parties on June 17, 2019, the court has listened to the recording of the proceeding where the agreement on the Motion to Quash was discussed. Though Plaintiff's counsel did say that "if the contents are what Mr. Libby says they are, the motion will be granted," he also says just moments later "if there is artwork in there, we will have to go further." As a result, the record is ambiguous as to the parties' actual agreement and the court will therefore not rule on the motion at this time. The motion will be considered along with other pending matters at the scheduled Trial Management Conference.

The Clerk is directed to incorporate this Order by reference into the docket for this case, pursuant to Rule 79(a), Maine Rules of Civil Procedure.

Dated: June 19, 2019

                                        _____
                                        Daniel I. Billings, Justice
                                        Maine Superior Court

STATE OF MAINE                                SUPERIOR COURT
SAGADAHOC, ss.                                CIVIL ACTION
                                              DOCKET NO. CV-19-02

PORTLAND MUSEUM OF ART,          )
                                 )
          Plaintiff              )
                                 )            ORDER ON PENDING MOTIONS
                                 )
     v.                          )
                                 )
ANNEMARIE GERMAIN,               )
                                 )
          Defendant.             )

The Defendant has failed to make the showings required by Rules 4A and 4B of the Maine Rules of Civil Procedure. Therefore, the Defendant's Motion to Modify Order Approving Attachment and Attachment on Trustee Process is DENIED.

Bangor Savings Bank, as Trustee, seeks instruction from the court as to whether it should hold funds in a certain Trust Account pursuant to the Trustee Process Order. It is ORDERED that the account in question is subject to the provisions of the Trustee Process Order previously issued by this court and Bangor Savings Bank must continue to hold the funds in the Trust Account in question.

Dated: February 15, 2019

_____
Daniel I. Billings, Justice
Maine Superior Court

| STATE OF MAINE | | SUPERIOR COURT |
| SAGADAHOC, ss. | | CIVIL ACTION |
| | | DOCKET NO. CV-19-02 |

| | | |
|---|---|---|
| PORTLAND MUSEUM OF ART, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | ORDER ON DEFENDANT'S |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| ANNEMARIE GERMAIN, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant Annemarie Germain's motion for summary judgment. Plaintiff Portland Museum of Art (the "PMA") has opposed this motion, and it is in order for decision. For the following reasons, the motion is denied.

I. BACKGROUND

The following facts are drawn from the parties' statements of material facts and are not in dispute except where otherwise indicated.

**A. The Relationship Between Ms. Germain and Mrs. Potter**

Newell Potter died in 2004, leaving all of his assets to his wife, Mrs. Eleanor Potter. (Pl.'s S.M.F. ¶ 108.) Before he died, he asked Ms. Germain to "watch out for his wife and make sure nobody takes advantage of her." (*Id.*) After Mr. Potter's death, Ms. Germain would visit Mrs. Potter on the weekends and would also see her during the week while they were working together at Warren Furniture in Westbrook. (Def.'s S.M.F. ¶ 1.) Mrs. Potter broke her leg in March 2012. (Def.'s S.M.F. ¶ 2.) Ms. Germain stayed with Mrs. Potter while she was recuperating from her leg injury but maintained a home in Biddeford Pool. (Def.'s S.M.F. ¶ 3.) Ms. Germain teased Mrs. Potter one day by saying, "I have to go home" and "you'd probably love it if I was here 24/7," and Mrs. Potter answered, "Oh, will you?" (Def.'s S.M.F. ¶ 4; Pl.'s Resp. to Def.'s S.M.F. ¶ 4.) Ms. Germain moved in with Mrs. Potter in March 2012 at Mrs. Potter's request. (Def.'s S.M.F. ¶ 5.)

On occasion, Mrs. Potter asked Ms. Germain to proofread checks, or to write out a check for Mrs. Potter to sign. (Def.'s S.M.F. ¶ 10.) The only instances in which Ms. Germain wrote out the amount of the check were at Mrs. Potter's specific direction. (*Id.* ¶ 11.) Mrs. Potter never pre-signed blank checks for Ms. Germain to complete, nor did she sign checks before the amount was written in. (*Id.* ¶ 12.) According to Ms. Germain, Mrs. Potter would write her a check "just because she likes the shirt you had on that day or the high heels you had on." (Pl.'s S.M.F. ¶ 126.)

After Ms. Germain was added to Mrs. Potter's TD Bank checking account in June of 2014, almost $100,000 was deposited into the account, which had never had checks issued out of it before. (*Id.* ¶ 127.) Ms. Germain also began receiving funds from this checking account. (*Id.*) In December 2014, Ms. Germain was added as a co-owner to all of Mrs. Potter's Bangor Savings Bank certificate of deposit accounts. (*Id.* ¶ 128.) By the time Mrs. Potter died, all of her funds belonged to Ms. Germain through joint accounts. (*Id.* ¶ 129.)

After she started working for Mrs. Potter, friends noticed paintings, jewelry, and other valuables in Ms. Germain's Biddeford Pool home. (*Id.* ¶ 130.) Ms. Germain also began driving a gold Cadillac that Mrs. Potter purchased for her. (*Id.* ¶ 131.) The next year, Mrs. Potter bought Ms. Germain a Jeep Wrangler, which Mrs. Potter had to use a stool to get into. (*Id.*) In December 2014, Mrs. Potter bought Ms. Germain a second Cadillac for her birthday. (*Id.*) Although Ms. Germain claims Mrs. Potter gifted her "thousands" of pieces of jewelry, Ms. Germain told her sister that she also found hidden jewelry in the house and kept it. (*Id.* ¶ 132.)[1] Mrs. Potter also funded Ms. Germain's extensive online shopping. (*Id.* ¶ 133.) Between January 2011 and March 2012, Mrs.

---

[1] Defendant admits Plaintiff's Statements of Material Facts No. 132, subject to the objection that the affidavit of Ms. Germain's sister is noncompliant with M.R. Civ. P. 56(e)'s requirement that affidavits be made on personal knowledge and shall show affirmatively that the affiant is competent to testify to the matters stated therein. As discussed more fully below, the Court has considered the extent to which Plaintiff's affidavits appear to be based on personal knowledge.

Potter charged less than $1,500 to her credit card. (*Id.* ¶ 134.) In 2013, Mrs. Potter charged $29,692.96 to her credit card, and she charged $39,046.00 in 2014. (*Id.* ¶ 135.) Although Mrs. Potter's attorneys thought Mrs. Potter was paying Ms. Germain $5,000 per month, Ms. Germain received $111,500 from Mrs. Potter's Bangor Savings Bank checking account in 2014 alone. (*Id.* ¶ 136.) Darrell Perry, a contractor who was hired to make improvements to Mrs. Potter's home "for the benefit of Annemarie" which included adding a sunroom and renovating the kitchen, and who witnessed Mrs. Potter's October 2, 2014 Will, was paid $17,450.00 in 2013 and $46,040.56 in 2014. (*Id.* ¶ 138.)

When Mrs. Potter visited with her step-grandchildren, Ms. Germain would not leave Mrs. Potter alone with them, and Mrs. Potter did not engage in their conversations and sounded "scared and nervous" when she spoke. (*Id.* ¶ 115.) When Mrs. Potter was hospitalized in 2014, her family was not informed. (*Id.* ¶ 116.)[2]

### B. The March 2014 Will

In the mid-1990s, Mrs. Potter and her husband created reciprocal Wills and Trusts that would provide for Mr. Potter's grandchildren. (Pl.'s S.M.F. ¶ 139.) Mrs. Potter later executed another Will on November 28, 2005. (Def.'s S.M.F. ¶ 17.) The only bequest the 2005 Will made to the PMA was a gold necklace, and even then, only in the event Barbara Greenburg Harrison was not alive at the time of Mrs. Potter's death. (*Id.* ¶ 19.) The next Will Mrs. Potter executed is dated December 11, 2007 and contained the same bequest to the PMA as the 2005 Will. (*Id.* ¶¶ 20-21.)

---

[2] Defendant admits Plaintiff's Statements of Material Facts No. 115 and 116, subject to the objection that the affidavits of Mrs. Potter's step-grandchildren are noncompliant with M.R. Civ. P. 56(e)'s. As discussed below, the Court has considered the extent to which Plaintiff's affidavits appear to be based on personal knowledge.

Mrs. Potter first spoke with Attorney Kelley Young about the possibility of creating a trust for her sister, Barbara Coleman, in 2009. (Pl.'s S.M.F. ¶ 140.)[3] The idea of revising her estate plan to include a trust was revisited with Attorney Young and Attorney Matthew Goldfarb, Mrs. Potter's longtime lawyer and friend of 45 years, in the spring of 2013. (*Id.* ¶ 141.) Ultimately, the only aspect to be determined was what to do about Mrs. Potter's residuary estate. (*Id.* ¶ 143.) After considering the matter for over two years, Mrs. Potter decided to name the PMA as the residuary beneficiary of her estate. (*See id.* ¶ 145; Def.'s Reply S.M.F. ¶ 145.)

Consistent with Mrs. Potter's expressed wishes, Attorney Young prepared a pour-over will that devised her estate to a trust that would be administered primarily for the benefit of Mrs. Coleman. (Pl.'s S.M.F. ¶ 149.) According to her trust agreement, upon her death, her trustees – Attorney Goldfarb and Hugh Judge of R.M. Davis, Inc. – were to retain $500,000 for Mrs. Coleman's benefit, distribute her home to Ms. Germain, make specific gifts to Mrs. Potter's step-daughter, step-grandchildren and other charitable interests, and then distribute the balance to the PMA free and clear of trust, amounting to approximately $1.2 to $2 million, depending on how much was left after Mrs. Potter's passing. (*Id.* ¶ 150.) The PMA was also the remainder beneficiary of the funds set aside for Mrs. Coleman. (*Id.* ¶ 151.) Attorney Goldfarb did not believe the desired distribution of Mrs. Potter's home to Ms. Germain was the result of undue influence. (Def.'s S.M.F. ¶ 34.)

Ms. Germain was not present at the initial meeting to discuss changing the 2007 Will on September 18, 2013, and she did not bring Mrs. Potter to that meeting. (*Id.* ¶ 33.) Prior to execution, Attorneys Goldfarb and Young reviewed Mrs. Potter's estate plan alone with her paragraph-by-

---

[3] Defendant qualifies this statement and Statement No. 141 to the extent they are drafted to make it appear as if Mrs. Potter approached the attorneys specifically about creating a trust. It is clear Mrs. Potter engaged Attorneys Young and Goldfarb for the purpose of revising her estate plan, and the issue of creating a trust for her sister was discussed.

paragraph, and Attorney Young made Mrs. Potter aware of everything that was in her trust. (Pl.'s S.M.F. ¶ 153.) The attorneys then invited Ms. Germain into the room and reviewed the basic sketch of the estate plan with her. (*Id.* ¶ 155.) Although Mrs. Potter's trust specifically directed her trustees to deed her home to Ms. Germain, Ms. Germain complained "loudly and vociferously about the fact that her name wasn't mentioned in the will" and "that she was not happy with the will and trust." (*Id.* ¶ 156.)[4] Attorney Young then asked Ms. Germain to leave the room while Mrs. Potter executed the documents. (*Id.* ¶ 157.)

Mrs. Potter executed the Will and Trust on March 18, 2014. (Def.'s S.M.F. ¶ 23.) The process of changing the Will took two-and-a-half years. (*Id.* ¶ 29; Pl.'s Resp. to Def.'s S.M.F. ¶ 29.) Attorney Young mailed Mrs. Potter a copy of her estate planning documents on April 25, 2014. (Pl.'s S.M.F. ¶ 161.)

On June 5, 2014, Mrs. Potter called Attorney Young out of the blue, saying she urgently wanted to make changes to her estate plan. (Pl.'s S.M.F. ¶ 164.) Prior to that date, Mrs. Potter had never expressed any concerns about her estate plan to Attorneys Young and Goldfarb. (*Id.* ¶ 165.) Troubled and suspicious of Ms. Germain, Attorney Young suggested a face-to-face meeting alone with Mrs. Potter, which she refused. (*Id.* ¶ 166.) A few days later, Mrs. Potter called again and insisted that Attorney Young "tear up her will." (*Id.* ¶ 167.) Attorney Young does not believe that Mrs. Potter's instruction to destroy her March 2014 Will and Trust reflected her personal desire or decision, but was the result of an idea "that Matt Goldfarb and Hugh Judge were stealing Eleanor's property ... that Anna had planted." (*Id.* ¶ 169.) Concerned that Mrs. Potter was being influenced by Ms. Germain, Attorney Young responded that he would not tear up the will, but would deliver

---

[4] Citing Attorney Goldfarb's deposition testimony, Ms. Germain qualifies this statement by noting: "Attorney Goldfarb went on to testify that he responded 'I am directed to see that you get the house and a generous stipend,' and that 'that was basically it.'" (Def.'s Reply S.M.F. ¶ 156.)

the documents to her or send them to her new lawyer. (*Id.* ¶ 170.) Mrs. Potter refused to reveal the identity of her new lawyer, would not allow Attorney Young to send her prior estate planning documents to her new lawyer, which was "unusual," and instead told Attorney Young to bring her the documents. (*Id.* ¶ 171.)

When Attorney Young hand-delivered Mrs. Potter's estate planning documents on June 10, 2014, Ms. Germain opened the door and, in front of Mrs. Potter, started "berat[ing]" Attorney Young. (*Id.* ¶ 172.) Ms. Germain called Attorney Young "a thief," and told him to "admit to Eleanor" that Attorneys Young and Goldfarb and Hugh Judge "were stealing from Eleanor" by placing her assets into a trust they would administer. (*Id.* ¶ 173.) Mrs. Potter asked Attorney Young, "Why are you stealing from me?" (*Id.* ¶ 174.) When Attorney Young tried to explain that this was not the case, Ms. Germain interjected and called Attorney Young a "pansy ass," claiming he forced Mrs. Potter "to sign something she didn't want when [they] asked Anna to leave the room." (*Id.* ¶ 175.) Ms. Germain again complained that "her name was not in the will" and that the house was not going to her, despite the clear language of Mrs. Potter's trust instrument. (*Id.* ¶ 176.) When Attorney Young tried to show Ms. Germain that she was in fact receiving the house, Ms. Germain threatened to put Attorney Young's name "all over the Old Port as a thief." (*Id.* ¶ 177.)[5] The next day, Mrs. Potter fired Attorney Goldfarb. (*Id.* ¶ 178.) When Attorney Goldfarb called her to seek an explanation, Mrs. Potter refused to talk to him. (*Id.* ¶ 179.)

**C. The October 2014 Will**

On June 3, 2014, Ms. Germain and Mrs. Potter met with Attorney Richard LeBlanc. (Def.'s S.M.F. ¶ 50.) During the meeting, it was discussed that Donald Coleman's IRA of over $250,000

---

[5] Curiously, Defendant admits to the entirety of this confrontation without qualification in her reply statement of material facts, despite denying most of the substance of this interaction during her deposition. (*Compare* Def.'s Reply S.M.F. ¶¶ 172-177 *with* Germain Dep. 209:3-212:23.)

would pass directly to Mrs. Coleman, and that there seemed to be a number of joint accounts that now belonged to Mrs. Coleman alone, as well as a residence owned as tenants-in-common so that Mr. Coleman's 50% interest would pass to a trust to Mrs. Coleman. (*Id.* ¶ 51.)

Attorney Nelson Toner began representing Mrs. Potter during the summer of 2014. (*Id.* ¶ 59; Pl.'s Resp. to Def.'s S.M.F. ¶ 59.) Attorney Toner first learned of Mrs. Potter through Attorney LeBlanc, who had contacted Attorney Toner to ask for help with Mrs. Coleman. (Def.'s S.M.F. ¶ 61.) When introducing Attorney Toner to the situation with Mrs. Potter, Attorney LeBlanc told Attorney Toner that Ms. Germain was a caregiver for Mrs. Potter and lived with her at the home. (*Id.* ¶ 91.)

Attorney Young expected to hear from Mrs. Potter's new attorney to request a copy of his file and to discuss Mrs. Potter's prior estate plan, as is typical, but he was "baffled" when this "call never came." (Pl.'s S.M.F. ¶ 182.) Shortly after Mrs. Potter had retained Attorney Toner, Attorney LeBlanc called him to express his own concerns about Mrs. Potter's relationship with Ms. Germain, telling Attorney Toner that he had witnessed Mrs. Potter being "coach[ed]" by Ms. Germain. (*Id.* ¶ 183.)

Attorney Toner's first meeting with Mrs. Potter was sometime between July 9 and July 14, 2014. (Def.'s S.M.F. ¶ 64.) When Attorney Toner arrived for the meeting, he was greeted by Ms. Germain. (*Id.* ¶ 67.) During the beginning of the meeting, Attorney Toner, Ms. Germain, and Mrs. Potter were all sitting at the dining room table. (*Id.* ¶ 68.) According to Attorney Toner's billing records, the initial meeting lasted 30 minutes. (*Id.* ¶ 71.) Attorney Toner met three times with Mrs. Potter for a combined total of little more than an hour. (Pl.'s S.M.F. ¶ 185.)

Mrs. Potter wanted to simplify her estate plan and write a new estate plan. (Def.'s S.M.F. ¶ 72.) Attorney Toner did not speak to Attorneys Goldfarb or Young about the prior estate plan

because he felt that he could help execute her wishes without knowing why she was upset with Attorneys Goldfarb and Young. (*Id.* ¶ 79.) Attorney Toner's notes from the initial meeting read "Assets to Annemarie Germain" under the heading "Ellie's Will Discussion." (*Id.* ¶ 83.) During the meeting, Mrs. Potter also specifically discussed having Ms. Germain serve as her personal representative. (*Id.* ¶ 86.) Attorney Toner was told that Mrs. Potter was unhappy with her estate plan because it reflected "someone else's goals and objectives" and did not leave all of her assets to Ms. Germain, but he did not learn any specifics about her prior estate plan, its beneficiaries, or the true extent of her assets. (Pl.'s S.M.F. ¶ 187.) He never saw or asked for a copy of the March 2014 Will and Trust, and he never thought to investigate whether Mrs. Potter had been given any misinformation about the Will and Trust; he simply "left it alone." (*Id.* ¶ 188.)

Mrs. Potter lived in the neighborhood where Attorney Toner grew up, but Attorney Toner did not know Mrs. Potter personally. (Def.'s S.M.F. ¶ 60.) Mrs. Potter was able to recall Attorney Toner's family living on Chenery Street, even though about 40 years had elapsed since they had lived on Chenery Street. (*Id.* ¶ 90.)

Attorney Toner drafted a will in August 2014 that left Mrs. Potter's entire estate to Ms. Germain. (Pl.'s S.M.F. ¶ 190.) He also drafted documents naming Ms. Germain as Mrs. Potter's financial power of attorney. (*Id.* ¶ 191.) On September 2, 2014, Ms. Germain called Attorney Toner to request instructions on how Mrs. Potter could finalize her will. (*Id.* ¶ 198.) Attorney Toner spoke with Ms. Germain three times between September 2 and September 9, 2014 concerning Mrs. Potter's will. (*Id.* ¶ 199.)

Mrs. Potter returned home from a stay in the hospital on September 24, 2014. (*Id.* ¶ 202.) The will prepared by Attorney Toner was executed on October 2, 2014. (Def.'s S.M.F. ¶ 100.) Mrs. Potter died on March 21, 2015 at the age of 90. (Pl.'s S.M.F. ¶ 211.) The October 2014 Will

was filed with the Cumberland County Probate Court on April 20, 2015. (Def.'s S.M.F. ¶ 101.) Mrs. Coleman died on August 6, 2018, and Ms. Germain is also the primary beneficiary of Mrs. Coleman's estate plan, which Attorney Toner drafted. (Pl.'s S.M.F. ¶ 215.)

The PMA filed its Complaint against Ms. Germain on August 2, 2017. The Complaint contains three counts: tortious interference with expected inheritance, undue influence/constructive trust, and demand for an accounting pursuant to 18-A M.R.S. § 5-916.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the factfinder must choose between competing versions of the truth." *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821 (internal citation and quotation marks omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

If the moving party's motion for summary judgment is properly supported, the burden then shifts to the non-moving party to respond with specific facts indicating a genuine issue for trial in order to avoid summary judgment. M.R. Civ. P. 56(e). When a defendant moves for summary judgment, the plaintiff must respond with evidence establishing a prima facie case. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. The evidence proffered by the plaintiff "need not be persuasive at that stage, but the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*,

2013 ME 13, ¶ 19, 60 A.3d 759. If the plaintiff fails to present sufficient evidence, then the defendant is entitled to a summary judgment. *Watt*, 2009 ME 47, ¶ 21, 969 A.2d 897.

III. DISCUSSION

In this fact-intensive case, despite the existence of some facts upon which the parties agree, the parties' motion papers present two very different accounts of the relationship between Mrs. Potter and Ms. Germain and the circumstances surrounding the making of Mrs. Potter's will. As a summary of the undisputed facts, it is clear that until the fall of 2014, multiple versions of Mrs. Potter's will included bequests to members of her family and to charities including the PMA, as well as a bequest to Ms. Germain of her house, yet the version of Mrs. Potter's will in existence at the time of her death left her entire estate to Ms. Germain. How and why Mrs. Potter decided to change her will in this manner is vigorously disputed. There are a number of disputed facts not recounted above pertaining to the relationship between Ms. Germain and Mrs. Potter; Mrs. Potter's relationship with, and Ms. Germain's treatment of, Mrs. Potter's step-grandchildren; Mrs. Potter's physical and mental state during the last year of her life; and the circumstances surrounding the signing of the October 2014 will.

**A. Ms. Germain's evidentiary objections**

As a threshold matter, Ms. Germain has objected to the admissibility of much of the PMA's summary judgment evidence. The Court agrees with Ms. Germain on this matter in some respects. For instance, the PMA has not properly authenticated Mrs. Potter's medical records. *See* M.R. Evid. 803(6), 901. Attorney Frawley's affidavit is not sufficient to authenticate these documents. *Cf. Bank of Am., N.A. v. Greenleaf*, 2014 ME 89, ¶¶ 3, 34, 96 A.3d 700 (affirming order of sanctions for failure to comply with M.R. Civ. P. 56(e) when attorney inappropriately sought to create a foundation for admissibility of business records by submitting an affidavit regarding his

own knowledge of bank's recordkeeping practices and asserting facts about which he lacked personal knowledge). The Court agrees with Ms. Germain that the medical records, as presented by the PMA, are not admissible at this stage.

Ms. Germain further argues that the affidavit of Judith Montgomery should be excluded because the PMA's interrogatory responses only identified Ms. Montgomery as a "witness with knowledge of Defendant's relationship with Mrs. Potter" and did not provide her address or phone number as requested by the interrogatory. Ms. Germain alleges that "[f]rom the content of the [August 21, 2018] affidavit, PMA obviously knew more information than it disclosed at the Rule 26(g) conference" which was held on March 7, 2018 and in which the PMA represented that it had disclosed all responsive information it possessed at the time. Given that, according to her affidavit, Ms. Montgomery's property abuts Mrs. Potter's property, it seems likely the PMA knew Ms. Montgomery's address when responding to Ms. Germain's interrogatories and failed to disclose that address. Even if her address was not known at that time, it was obviously discovered by the PMA sometime between March 7, 2018 and August 21, 2018. While the duty to supplement discovery responses is quite limited in Maine, a party is nonetheless "under a duty seasonably to supplement the response with respect to any question directly addressed to … the identity and location of persons having knowledge of discoverable matters…." M.R. Civ. P. 26(e)(1). The Court finds the PMA failed to seasonably supplement its discovery response. In doing so, Ms. Germain was prejudiced because she was not able to ascertain Ms. Montgomery's location in order to properly investigate her knowledge of the relationship between Ms. Germain and Mrs. Potter. The Court will exclude Ms. Montgomery's affidavit from its consideration of this motion.

Ms. Germain further argues that the PMA's affidavits are insufficient because the jurats are sworn on knowledge, information and belief. The jurat of Attorney Young, for example, states:

Before me personally appeared the above-named, D. Kelley Young, who swore to the truth of the facts in the foregoing affidavit of his own knowledge or on information and belief and, to the extent on information and belief, he has reason to believe and does believe them to be true.

(Pl.'s Opp'n to Mot. Summ. J., Ex. 2.) While it is correct that "[a]ffidavits in support of a motion for summary judgment that are solely based upon information and belief are insufficient," such affidavit "may be considered ... if the affidavit otherwise shows that it was made from personal knowledge." *Dineen v. Star Press, Inc.*, 391 A.2d 834, 835 (Me. 1978). Rather than disregard all of the PMA's affidavits in full, the Court has carefully considered the basis for personal knowledge in each affidavit relied upon in this Order.

While the PMA has failed to properly authenticate some of its evidence and the Court is excluding Judith Montgomery's affidavit, the Court nonetheless finds the PMA has proferred sufficient admissible evidence to create a prima facie case on each count of its Complaint.

**B. Count I: Tortious interference with expected inheritance**

A claim for tortious interference with expected inheritance requires proof of (1) the existence of an expectancy of inheritance; (2) an intentional interference by a defendant through tortious conduct, such as fraud, duress, or undue influence; (3) a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from the interference. *Morrill v. Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039. Ms. Germain contends the PMA cannot satisfy its burden to prove the second and third elements of this claim.

*1. Undue influence*

The parties first dispute whether the PMA has produced evidence of intentional interference through undue influence. "'Undue influence is defined as unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the

relationship between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.'" *Cote v. Cote*, 2016 ME 94, ¶ 14, 143 A.3d 117 (quoting *Theriault v. Burnham*, 2010 ME 82, ¶ 6, 2 A.3d 324) (internal alteration omitted).

a. Confidential relationship

"A presumption of undue influence arises 'if the plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the defendant and the decedent.'" *Id.* "'A confidential relationship is one in which an individual placed trust and confidence in the defendant and there was a great disparity of position and influence in the relationship.'" *Id.* The PMA argues undue influence may be presumed in this case because Mrs. Potter and Ms. Germain were engaged in a confidential relationship.

The existence of a confidential relationship is a question of fact, *Cote*, 2016 ME 94, ¶ 14, 143 A.3d 117, and a number of disputed facts inform the question in this case. Ms. Germain testified she did "[w]hatever she wanted, whatever she needed, whatever I felt needed to be done" for Mrs. Potter, including sometimes taking her to doctors' appointments and cooking meals, as well as verifying Mrs. Potter filled out checks correctly. (Germain Dep. 37:15-38:6.) Ms. Germain was taking care of Mrs. Potter in the last years of her life, during which time Mrs. Potter repeatedly required hospitalization and was likely physically vulnerable. Ms. Germain insisted that she never helped Mrs. Potter with her finances and that Mrs. Potter "did her own finances." (Germain Dep. 37:23-38:6.) Despite this assertion, there is no dispute that Ms. Germain was added as a co-owner to all of Mrs. Potter's Bangor Savings Bank certificate of deposit accounts, and by the time Mrs. Potter died, all of her funds belonged to Ms. Germain through joint accounts. There is also evidence in the record that Ms. Germain had use of Mrs. Potter's credit cards and contracted for over $60,000 worth of improvements to Mrs. Potter's home. A strong inference can be made based

on the evidence presented by the PMA that Ms. Germain made liberal use of her access to Mrs. Potter's credit cards. Regardless of how Ms. Germain defines "doing one's finances," the PMA has presented evidence that Mrs. Potter was not managing her money independently.

The Court also finds it notable that Ms. Germain describes the relationship as: "her and I lived as a mother and a daughter" and testified that when someone erroneously referred to Ms. Germain as Mrs. Potter's daughter, Mrs. Potter "would not correct them. ... She would never say that's not my daughter." (Germain Dep. 39:14-15; 150:6-20.) While Ms. Germain and Mrs. Potter were not familial relations, confidential relationships are not confined to familial relationships. However, the Law Court has referred to familial relationships to describe characteristics of confidential relationships as follows:

> That the parties are related by blood or marriage may lead a court to find that a confidential relation exists, where there is evidence as to trusting and where the blood or family relationship is in a close degree so that the imposition of great trust and the letting down of all guards and bars is natural. But mere kinship itself does not establish a confidential relation; often relatives are hostile to each other or deal at arm's length and act independently and so are held not to have been a confidential relation.

*Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975). Based on Ms. Germain's testimony, an inference could be drawn that she and Mrs. Potter regarded each other as familial relations and consequently, rather than deal with one another at arm's length, their relationship involved "great trust and the letting down of all guards and bars." *Id.* The Court finds a genuine issue of material fact as to whether Ms. Germain and Mrs. Potter shared a confidential relationship.

Assuming the factfinder were to conclude a confidential relationship existed, a presumption of undue influence would be raised, and Defendant would have the burden to come forward with "evidence tending to affirmatively show entire fairness on his part and freedom of the other from undue influence." *Id.* at 37. The Court finds there is likewise a genuine issue of

material fact as to whether Ms. Germain's dealings with Mrs. Potter were entirely fair and free from undue influence.

b. Evidence of undue influence

The PMA contends that even if Ms. Germain and Mrs. Potter did not have a confidential relationship, the facts support a finding of undue influence. The Court agrees and finds the PMA has proferred sufficient evidence to demonstrate a genuine issue of material fact as to whether Mrs. Potter was unduly influenced to sign the October 2014 Will.

A summary of some of the facts indicating the existence of undue influence follows: Ms. Germain would not leave Mrs. Potter alone with her step-grandchildren, who were beneficiaries of Mrs. Potter's prior wills. Ms. Germain was not initially involved in the decision to change Mrs. Potter's 2007 Will, and Mrs. Potter spent two-and-a-half years working with her attorneys to create a new estate plan. Mrs. Potter signed the March 2014 Will and Trust after reviewing it paragraph-by-paragraph with Attorneys Goldfarb and Young, out of the presence of Ms. Germain. When the attorneys reviewed the estate plan with Ms. Germain, she verbally expressed that she was not happy with it. When Attorney Young hand-delivered the estate planning documents to Mrs. Potter's home, Ms. Germain answered the door, berated Attorney Young in front of Mrs. Potter, and again complained about the contents of the Will. Mrs. Potter was under the impression, almost certainly erroneous, that Attorneys Young and Goldfarb were stealing from her.

Ms. Germain and Mrs. Potter together met with Attorney LeBlanc, who put them in contact with Attorney Toner. Ms. Germain was also present for at least a portion of the first meeting with Attorney Toner. After three brief meetings, Attorney Toner drafted a will leaving Mrs. Potter's entire estate to Ms. Germain and documents appointing Ms. Germain as Mrs. Potter's financial power of attorney. Ms. Germain spoke to Attorney Toner at least three times before Mrs. Potter

signed the October 2014 Will. The October 2014 Will was signed during the last few months of Mrs. Potter's life, ten days after she returned home from a stay in the hospital. There is evidence, albeit at least partially disputed by Ms. Germain, that Mrs. Potter signed her final Will when Ms. Germain was present and Attorney Toner was not. (*See* Pl.'s S.M.F. ¶¶ 203-206.) Attorneys Young and LeBlanc at least suspected Ms. Germain was coaching Mrs. Potter.

Ms. Germain insists the PMA cannot prove undue influence because Mrs. Potter's decision to change her will was made independently, and she secured independent counsel to carry out her wishes. At this point, it is not entirely clear how Mrs. Potter came to be represented by Attorney Toner; however, viewing the evidence in the light most favorable to the PMA, there is some evidence that Attorney Toner was not truly independent. For instance, it is suspicious that Attorney Toner also drafted Mrs. Coleman's will, of which Ms. Germain is also the primary beneficiary. Ms. Germain also had multiple conversations with Attorney Toner, some of which appear to have occurred outside of Mrs. Potter's presence. These facts raise an inference that Ms. Germain was instrumental in establishing the relationship between Attorney Toner and Mrs. Potter which ultimately led to the execution of the will leaving Mrs. Potter's entire estate to Ms. Germain. This evidence is not conclusive proof of Attorney Toner's lack of independence, but it supports more than mere speculation. *See Estate of Smith*, 2013 ME 13, ¶ 19, 60 A.3d 759.

Considering the facts recounted above in conjunction with the many disputed facts the parties have alleged surrounding the creation of the October 2014 Will, the Court concludes the PMA has proffered sufficient evidence of undue influence to survive summary judgment.

*2. Causation*

The causation element of tortious interference requires a plaintiff to show "a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's

interference." *Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039. Viewing the facts in the light most favorable to the PMA, there is ample evidence in the record that Ms. Germain's interference was the "but for" cause of the changes to Mrs. Potter's estate plan which resulted in the PMA's loss of its expected inheritance. Ms. Germain openly expressed her displeasure over the March 2014 will and berated Attorney Young in front of Mrs. Potter. When Attorney Young came to Mrs. Potter's house to deliver her estate planning documents, Mrs. Potter asked him, "Why are you stealing from me?" and a reasonable inference can be drawn that Ms. Germain was the source of this belief. There is also evidence that Ms. Germain may have orchestrated the relationship between Mrs. Potter and Attorney Toner and may have coached Mrs. Potter into changing her will to leave her entire estate to Ms. Germain. This evidence is sufficient for this claim to survive a motion for summary judgment.

What Ms. Germain has offered with this motion is one interpretation of the facts of this case. The PMA, however, has put forth sufficient evidence to support an alternative interpretation which would warrant a finding of tortious interference with expected inheritance. Many disputed facts color each interpretation, and factfinding in this case will depend heavily on a number of credibility determinations. Summary judgment cannot be granted "when the factfinder must choose between competing versions of the truth," *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821, and therefore summary judgment must be denied on this count.

### C. Count II: Undue influence/constructive trust

Ms. Germain argues that, as with the PMA's claim for tortious interference, it also cannot support its claim for undue influence and constructive trust because it has not proferred evidence of undue influence or other tortious conduct. Ms. Germain notes, further, that this claim must be proven by clear and convincing evidence, and that the heightened standard of proof should be

taken into consideration at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986). The PMA counters that, regardless of the standard of proof, it has made a prima facie case for this claim. The Court agrees with the PMA.

Similarly to the undue influence element of tortious interference, in order to support a claim for undue influence and imposition of a constructive trust, a plaintiff must show that "it was highly probable that defendants exerted unfair persuasion on the plaintiff while she was (1) under defendant's domination or (2) justified in assuming that defendants would not act in a manner inconsistent with her welfare by virtue of the relationship between them." *Dolloff v. Dolloff*, 593 A.2d 1044, 1046 (Me. 1991). "[A] party's weakness, infirmity, or advanced age" as well as "family relationships such as parent-child" may be factored into the determination of whether there was undue influence. *Id.* As explained at length above regarding the PMA's claim for tortious interference, the PMA has submitted sufficient evidence of undue influence to generate a genuine issue of material fact to be resolved by a factfinder, even considering the PMA's heightened standard of proof required by this claim.

**D. Count III: Accounting under 18-A M.R.S. §5-916**

The Court also declines to enter summary judgment on Count III of the Complaint, which demands an accounting of all assets held or formerly held by Mrs. Potter and all financial transactions conducted by Mrs. Potter or by Ms. Germain on Mrs. Potter's behalf since the date Ms. Germain became Mrs. Potter's power of attorney and the date of Mrs. Potter's death.

Ms. Germain argues the Maine Uniform Power of Attorney Act, 18-A M.R.S. 5-901 *et seq.*, does not apply to this case because there is no longer a principal-agent relationship between Mrs. Potter and Ms. Germain due to Mrs. Potter's death. Ms. Germain contends this conclusion is supported by the language of the statute, which provides a petition may be filed in the county "in

which either the principal or the agent resides." 18-A M.R.S. § 5-916(a). Specifically, Ms. Germain argues "there was no principal or agent when the petition was filed; Mrs. Potter was deceased, terminating the power of attorney and the principal/agent relationship." (Def.'s Mot. Summ. J. 17.) The PMA counters that the statute does not require the petition to be filed during the life of the principal.

The parties both cite authority from other jurisdictions to support their opposing interpretations of the applicability of the Uniform Power of Attorney Act following the death of the principal. *Compare In re Edward J. Burke Estate*, No. 10768-MA, 2016 Del. Ch. LEXIS 121, at *15-17 (Aug. 10, 2016) (finding petition for accounting should have been filed prior to principal's death) *with Smith v. Smith*, No. 45313, 2018 Ida. LEXIS 216, at *21-23 (Dec. 18, 2018) (finding statute's plain language does not expressly require petition to be made before principal's death). This Court generally agrees with the Idaho Supreme Court that while some of the statutory language could support the interpretation proposed by Ms. Germain, a time limit should not be read into the statute when the text does not expressly contain one. The Court finds Mrs. Potter's death does not bar the PMA's petition for an accounting pursuant to 18-A M.R.S. § 5-916.

Ms. Germain also argues summary judgment should be granted on this Count because she never invoked the power of attorney granted by Mrs. Potter and therefore there are no transactions to be reviewed. Ms. Germain has not submitted an affidavit to support this contention, and based on the record before the Court, it is unclear whether this statement is accurate. The Court thus declines to grant summary judgment on this ground as well.

IV. CONCLUSION

For the foregoing reasons, Defendant Annemarie Germain's Motion for Summary Judgment is DENIED.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: February 15, 2019

Daniel I. Billings, Justice
Maine Superior Court