STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
CIVIL ACTION
DOCKET NO. BCD-CIV-2022-00011

THE VILLAGE AT OCEAN'S END
CONDOMINIUM,

Plaintiff & Counterclaim-Defendant,

v.

SOUTHWEST HARBOR
PROPERTIES, LLC, et al.,

Defendants & Counterclaim-Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFF'S ADDITIONAL
MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' CROSS-MOTION
FOR PARTIAL SUMMARY
JUDGMENT

## INTRODUCTION

This matter is again before the court on a second round of cross-motions for summary judgment filed by Plaintiff/Counterclaim-Defendant The Village at Ocean's End Condominium Association (the "Association") and by Defendants/Counterclaim-Plaintiffs Southwest Harbor Properties, LLC, Howland Real Estate, LLC, and Jeffrey Howland.[1]

The Association filed its Additional Motion for Partial Summary Judgment on January 31, 2023. The motion asserts that the Association is entitled to summary judgments on Counts III, V, and VI of its Complaint, as well as to a declaration by this court that Southwest Harbor Properties, LLC (the "Declarant") must pay the Association's attorney's fees and expenses related to the

---

[1] Each party earlier submitted a Motion for Partial Summary Judgment focused on whether certain shoreline property (1) was lawfully and effectively withdrawn from the Village at Ocean's End Condominium by Southwest Harbor Properties, LLC, and (2) whether, subsequent to that withdrawal and a reconveyance of the withdrawn property, Defendant Howland Real Estate, LLC lawfully leased the property to the Association. (Compl. ¶¶ 32, 36; Countercl. ¶¶ 50-54.) On April 12, 2023, the court addressed these issues in its Order Denying Plaintiff's Motion for Partial Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment, *The Village at Ocean's End Condominium v. Southwest Harbor Properties, LLC*, BCD-CIV-2022-00011, slip op. (Apr. 12, 2023).

1

above-captioned lawsuit.[2] The Declarant filed a Cross-Motion for Partial Summary Judgment on April 3, 2023. The cross-motion opposes the Association's Additional Motion for Partial Summary Judgment, and it otherwise seeks a summary judgment in favor of the Declarant on Counts III through VI of its Counterclaim.[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the parties' statements of material facts and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400 (citing M.R. Civ. P. 56(c)). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view the record facts in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897 (citations omitted).

The moving party has the burden to show why summary judgment is appropriate. *Cote Corp. v. Kelley Earthworks, Inc.*, 2014 ME 93, ¶ 8, 97 A.3d 127. Thus, when the plaintiff is the

---

[2] Through Count III of its Complaint, the Association seeks payment of unpaid common expense dues assessed against units owned by the Declarant between March of 2021 through the present. Through Count V, it seeks payment of two months' dues paid by new-unit purchasers at closing on their units and collected by the Declarant. Through Count VI, the Association seeks a declaration that it is not liable on a certain $15,000 loan claimed by the Declarant. (Compl. ¶¶ 37-39, 43-46.)

[3] In Count III of its Counterclaim, the Declarant seeks a declaration that a rate and method of assessment for common expenses imposed upon it by the Association are unlawful and that it is without obligation to pay assessments calculated thereunder. In Count IV, it seeks a declaration that it is entitled to vote its units as of the time when it begins paying assessments for them to the Association. The Declarant's Count V seeks a declaration that it is not liable for the two-months' common expenses collected from new-unit purchasers, as alleged by the Association. And, in Count VI the Declarant seeks a declaration that it is entitled to repayment of the $15,000 loan that it gave to the Association. (Countercl. ¶¶ 58-72.)

2

moving party, it has the burden to demonstrate that each element of its claim is established in the record without a dispute of material fact. *Id.* (citation omitted). It then becomes the defendant's burden to demonstrate a genuine dispute of material fact. When the defendant is the moving party, "he must establish that there is no genuine dispute of fact and that the undisputed facts would entitle him to judgment as a matter of law." *Levis v. Konitzky*, 2016 ME 167, ¶ 20, 151 A.3d 20 (citation and internal quotation marks omitted). It then becomes the plaintiff's burden to "make out a prima facie case and demonstrate that there are disputed facts regarding issues material to the applicable law." *Id.* (citation and internal quotation marks omitted).

Finally, "[f]acts contained in a supporting ... statement of material facts, if supported by record citations as required by [Maine Rule of Civil Procedure 56(h)], shall be deemed admitted unless properly controverted." M.R. Civ. P. 56(h)(4). Specifically, "an assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion." *Id.* "The court may disregard any statement of fact not supported by a specific citation to record material." *Id.* The court may also disregard statements of material facts that "rest merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Est. of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 11 n.4, 157 A.3d 769 (citing *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821). Legal conclusions and arguments masquerading as factual statements or objections belong in the party's memorandum of law, not its statements of facts. *Dyer*, 2008 ME 106, ¶ 15 n.5, 951 A.2d 821.

The court does not accept as admitted either parties' statements of material facts that are unsupported by record citations, or that present conclusory allegations or legal argument.

## BACKGROUND

For the limited purpose of deciding the cross-motions for partial summary judgment, the

3

record evidence is sufficient to support the following facts.

## I.      The Declarant's acquisition of The Village at Ocean's End Condominium.

The Village at Ocean's End Condominium (the "Condominium") was established during 2009 by the initial declarant under the Declaration of The Village at Ocean's End Condominium (the "Declaration"). (Pl.'s S.M.F. ¶ 1; Defs.' S.M.F. ¶ 27.) Operation and management of the Condominium is governed by the Amended Bylaws of The Village at Ocean's End Condominium Association. (Pl.'s S.M.F. ¶ 2; Defs.' S.M.F. ¶ 28.) On October 21, 2009, the Town of Southwest Harbor approved the construction of up to forty units in the Condominium. (Pl.'s S.M.F. ¶ 3.)

The Declarant, Southwest Harbor Properties, LLC, succeeded the initial declarant when it purchased the real estate and associated development rights during August of 2013. (Defs.' S.M.F. ¶¶ 22-23.) At present, the Declarant is completing "Phase 1" of the Condominium's development, which involves construction of sixteen units. (Defs.' S.M.F. ¶ 25.) Two units were already under individual ownership when the Declarant acquired the Condominium. (Defs.' S.M.F. ¶¶ 30, 87.) However, none of the operating or other bank accounts contemplated by the Declaration had been established. (Defs.' S.M.F. ¶¶ 31-32.) Accordingly, the Declarant, through its attorney, undertook to set up bank accounts to enable the Association's management of the Condominium. (Defs.' S.M.F. ¶¶ 34-35.)

## II.     The Association's Board of Directors.

Pursuant to the Declaration, the period of "declarant control" of the Association was set to expire during May of 2016, seven years after the first conveyance of a condominium unit during May of 2009. (Defs.' S.M.F. ¶ 36.) However, because there were only a few unit owners other than the Declarant as of May of 2016, and these owners did not wish to serve on the Association's Board of Directors, the Declarant's principals operated the Association notwithstanding their

4

desire to cease doing so. (Defs.' S.M.F. ¶ 37.) Ultimately, at the Declarant's request, the period of declarant control was terminated during the Association's July 23, 2018, annual meeting. (Defs.' S.M.F. ¶ 38.)

Although the period of declarant control was terminated, the Declarant's principals continued serving on the Association's board because there was an insufficient number of other unit owners willing to. (Defs.' S.M.F. ¶ 39.) The unit owners present at the July 2018 annual meeting unanimously voted to elect the Declarant's principals, as well as an independent unit owner unaffiliated with the Declarant, to the Association's board. (Defs.' S.M.F. ¶ 40.) Thereafter, on July 31, 2018, those board members unanimously voted to approve and ratify all of the board's prior actions, in all respects. (Defs.' S.M.F. ¶ 41.) During February of 2021, the Condominium unit owners agreed to assume control of the Association by serving as its board directors and officers. (Defs.' S.M.F. ¶ 42.)

### III.    Assessments against the Declarant by the Association.

Since its acquisition of the Condominium, the Declarant has always understood that a "unit" comes into existence upon being declared by amendment to the Declaration's "Schedule C." (Defs.' S.M.F. ¶¶ 47, 49, 54.) The Declarant also understood that, once declared, a unit is subject to assessment regardless of whether it is built. (Defs.' S.M.F. ¶¶ 51-52, 54.)

Other than Unit 1, which was exempted from any obligation to pay fees or assessments by the initial declarant, Units 2 and 9 are the only units that were owned by the Declarant and that had a foundation in the ground during the time when the unit owners gained control of the Association.[4] (Defs.' S.M.F. ¶ 59.) On or about February 22, 2021, the Association sent the

---

[4] Unit 2 was eventually sold by the Declarant to the current unit owner during 2022, after the commencement of this lawsuit. (Defs.' S.M.F. ¶ 72.) During oral argument, the Declarant confirmed that, as of June 1, 2023, it owns four declared units, Units 1, 7, 9, and 16, out of the sixteen contemplated by Phase 1. Unit 1 is exempted from common

Declarant an invoice imposing an assessment on Unit 2, ostensibly because at the time that unit was the only declared unit owned by the Declarant with a foundation in place. (Defs.' S.M.F. ¶ 57.) The Declarant chose to pay the invoice due to its desire to act in good faith and otherwise to work amicably with the Association and its members; no other sums were due or claimed from the Declarant by the Association at the time. (Defs.' S.M.F. ¶ 58.)

By letter dated March 5, 2021, the Secretary for the Association acknowledged that he could not locate any authority for assessing the Declarant common expenses against its units until such time as a foundation was constructed. (Defs.' S.M.F. ¶ 60.) However, the Association changed its position shortly thereafter. (Defs.' S.M.F. ¶ 61.) By letter dated March 15, 2021, the Association notified the Declarant of the board's decision that the Declarant should pay dues on its six future home construction sites within the Condominium. (Defs.' S.M.F. ¶ 61.) In this letter, the Association, for the first time, asserted its right to impose assessments upon unbuilt and undeclared "units" at a rate equal to 80% of the assessment amount applicable to constructed condominium units. (Defs.' S.M.F. ¶ 61.) By letter dated March 25, 2021, the Declarant contested the Association's assertion as contrary to the Declaration and bylaws. (Defs.' S.M.F. ¶ 62.) The Association, through its Secretary, responded on March 28, 2021, to affirm its position. (Defs.' S.M.F. ¶ 63.)

The Declarant, at the advice of counsel, ceased payment of dues assessed on its units beginning during March of 2021. (Pl.'s S.M.F. ¶ 110; Defs.' S.M.F. ¶ 70.) As of February of 2023, the Association billed the Declarant $41,930.46 for unpaid assessments, penalties, and interest.[5] (Pl.'s S.M.F. ¶ 16.) The Declarant has not made any payments to the Association

_____

expense assessments. The Declarant also owns the building sites designated for three more Phase 1-units, Units 12, 13 and 14, which units are neither declared nor built.
[5] As of the parties' June 1, 2023, oral argument on the cross-motions for partial summary judgment, the Association represented to the court that the unpaid assessments, penalties and interest amount to more than $51,000.

towards satisfaction of the outstanding assessments against its units. (Pl.'s S.M.F. ¶ 19.)

## IV.  The Declarant right to vote its units.

Since its acquisition of the Condominium, the Declarant has also always understood that a unit owner has the right to vote their unit once it is declared, regardless of whether it is completely built or has a foundation in place. (Defs.' S.M.F. ¶¶ 50, 54.) Through its correspondence with the Declarant during March of 2021, the Association also expressed a new position regarding for which of its units the Declarant is entitled to vote as unit owner on matters presented to the Association. (Defs.' S.M.F. ¶¶ 55, 60-61.) Specifically, the Association declined to permit the Declarant to vote any of its declared units for which no foundation was constructed. (Defs.' S.M.F. ¶¶ 55, 60-61.) Notwithstanding its denial of the Declarant's purported right to vote these units, the Association assesses common expenses against each of them. (Defs.' S.M.F. ¶ 61.)

## V.  Two-months' common expenses prepaid by new unit owners.

Pursuant to the Declaration, contemporaneous with the initial conveyance of a unit the Declarant is required to (1) collect from the unit-purchaser two-months' estimated common expenses for the conveyed unit, and (2) deposit the collected funds into the Association's working capital fund account segregated from the Association's other bank accounts. (Pl.'s S.M.F. ¶ 6.) No funds representing two-months' common expense charges for either of Units 1 or 2, the two units in existence when the Condominium was established, were transferred to the Declarant. (Defs.' S.M.F. ¶¶ 33, 87.) There is no record of deposits by the Declarant into a working capital fund account related to prepaid estimated common expense charges that it collected from closings on condominium units.[6] (Pl.'s S.M.F. ¶¶ 11-12, 17-18.) However, the Declarant collected estimated two-months' common expense charges for each of the units it sold, and it deposited

---

[6] The amount claimed by the Association is $3,946.80. (Pl.'s S.M.F. ¶¶ 12, 115.)

7

those funds into the Association's operating bank account. (Defs.' S.M.F. ¶¶ 88-89; Jerry Howland Aff., Ex. 18.)

## VI.    The Declarant's $15,000 loan to the Association.

During the period of declarant control between 2014 and 2018, the Declarant subsidized the operation of the Condominium and the payment of its expenses by both depositing funds into the Association's operating bank account and by directly paying its bills and expenses. (Defs.' S.M.F. ¶ 76.) This practice continued after the period of declarant control terminated to lessen the amount of the Association's common expense assessments and to avoid any need to impose special assessments upon the unit owners. (Defs.' S.M.F. ¶ 77.)

During this time, one unit owner refused to pay common expenses assessed against his unit, which generated a shortfall for the Association in the approximate amount of $16,000. (Defs.' S.M.F. ¶ 78.) The Declarant deposited funds into the Association's operating account to make up for this shortfall. (Defs.' S.M.F. ¶ 79.) This loan and advancement was discussed with and among the Association's members during the annual meeting of August 28, 2019, when it was acknowledged that the Association would either repay the Declarant or credit it for the borrowed funds. (Defs.' S.M.F. ¶ 79.) Until this lawsuit was initiated, the Association never objected to repayment of funds loaned to it by the Declarant. (Defs.' S.M.F. ¶¶ 80, 82.)

According to the Declarant, the outstanding balance on its advances to the Association is $15,000. (Defs.' S.M.F. ¶ 83.) It has neither sought to assess interest on this amount nor commenced any independent action to collect the debt. (Defs.' S.M.F. ¶ 83.) Statements for the Association's operating bank account at Camden National Bank show deposits by the Declarant totaling $15,000 between September and October of 2020.[7] (Defs.' S.M.F. ¶ 81.) Likewise, the

---

[7] One deposit in the amount of $5,000 was made on September 30, 2020, and a second for $10,000 was made on October 11, 2020. (Defs.' S.M.F. ¶ 81; Kelm Aff., Ex. 37; Jerry Howland Aff., Ex. 16.)

8

Association's "2021 Budget" projection acknowledges that the Declarant advanced it $15,000 during 2020. (Defs.' S.M.F. ¶ 75; Jerry Howland Aff., Ex. 13.)

## DISCUSSION

The court addresses each of the issues raised by the parties' cross-motions for partial summary judgment in turn.[8] First, however, the court acknowledges issues that are not addressed herein. Apart from the issues raised in its Additional Motion for Partial Summary Judgment, the Association asserts two new claims in its reply brief submitted in opposition to the Declarant's Cross-Motion for Partial Summary Judgment and in support of the Association's motion. According to the Association, it now also claims that it is entitled to (1) repayment of $7,565.86, representing rental real estate commission rebates for the period 2014 through 2018, which funds were allegedly diverted into the Declarant's accounts, and (2) a declaration that the Defendants may neither cease their maintenance and upkeep of real estate withdrawn from the Condominium through the exercise of development rights, nor require the unit owners to pay for said maintenance. Neither of these issues are raised in the Complaint, and the court declines to address them. *See Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 21, 19 A.3d 823.

## I.    Assessments against the Declarant's units.

In its Additional Motion for Partial Summary Judgment, the Association argues it is entitled to a declaration that the Declarant must pay assessments on its "units," whether or not declared or otherwise constructed, and a judgment to recover unpaid assessments. According to

---

[8] There are four issues addressed by the parties' cross-motions for partial summary judgment that are properly before the court: (1) the Association's entitlement to common expense dues assessed against the Declarant between early 2021 and the present, and concomitantly the propriety of those assessments (Complaint Count III; Counterclaim Count III); (2) the Declarant's entitlement to vote its declared units that are not yet constructed (Counterclaim Count IV); (3) the Association's entitlement to and the Declarant's liability for two months' common expense dues collected by the Declarant from new unit owners (Complaint Count V; Counterclaim Count V); and (4) the Declarant's entitlement to and the Association's liability for repayment of $15,000 that the Declarant claims that it lent to the Association (Complaint Count VI; Counterclaim Count VI). Each party also asserts an entitlement to costs and attorney's fees related to this lawsuit due to the other party's purported breach of its fiduciary duties.

9

the Association, forty "units" were identified to the Town of Southwest Harbor. Further, the Declarant is liable for all "expenses in connection with real estate subject to development rights," which includes its unbuilt "units." 33 M.R.S. § 1603-107(b) (2023). And, the Association is authorized to levy assessments against individual units proportionally for any "common expense benefitting fewer than all of the units." *Id.* § 1603-115(c)(2) (2023); Jerry Howland Aff. Ex. 2 §§ 11.1(B), 13.1 [hereinafter Declaration].

Defendants, on the other hand, seek a summary judgment and declaration that no such assessments for the Declarant's units are due until such time as a certificate of occupancy is issued for that unit. *See* Declaration § 11.1(D). Accordingly, the Defendants assert that the Association's assessment of common expenses, at any rate, against the Declarant's undeclared and unbuilt "units" is unlawful and without legal basis.

As of the parties' June 1, 2023, oral argument on their cross-motions, the Declarant owned real estate for seven "units." This includes four declared units (Units 1, 7, 9 and 16), and three building sites (designated for Units 12, 13 and 14). Of the four declared units, the parties agree that Unit 1's liability for common expense assessments is limited by the Declaration. *See* Declaration § 2.4 & Schedule C. It is also undisputed that the Declarant has not paid common expense assessments since March of 2021.[9]

**a. A "unit" does not come into existence until it is declared.**

The Maine Condominium Act defines a "unit" as a "physical portion of the condominium designated for separate ownership or occupancy." 33 M.R.S. § 1601-103(26) (2023). Unless it is

---

[9] The court notes that the Association's denial of the Declarant's claimed right to vote its units subjected to common expense assessments is not a legal basis for the Declarant to withhold payment of common expense assessments for its declared units. To the contrary, according to the Declaration "[u]nit owners shall pay regular and special assessments and service charges levied by the Association without any deduct or offset whatsoever." Declaration § 11.3.

10

inconsistent with the Maine Condominium Act, a condominium is governed pursuant to the terms of its declaration. *Id.* § 1602-102(c). In this case, the Declaration expressly contemplates forty units; however, it acknowledged only two units in existence when it was executed and the Condominium was established. *See* Declaration, art. I & Schedule C. Among the Declarant's Development Rights, it is authorized to create units in addition to the two initial units. *Id.* § 4.1; *see* 33 M.R.S. § 1601-103(11) (defining "Development Rights").

The Declarant was required to amend the Declaration to reflect its exercise of Development Rights, including the creation of condominium units. Declaration § 4.1. Moreover, when it created a new condominium unit, the Declarant was specifically required to amend the Declaration's Schedule C to reallocate voting rights and common expense assessment liability among the declared units. *Id.* §§ 2.4, 4.1. Consequently, no unit is created or added to the Condominium until the Declaration is amended pursuant to its terms.

This means that no common expenses can be assessed by the Association against an undeclared "unit," because there is no allocation of common expense liability to a "unit" until it is declared or, in other words created, by amendment to Schedule C of the Declaration. In consideration of the Declaration's terms, neither the number of units contemplated by the Town of Southwest Harbor when the Condominium was established, nor the fact of whether a "unit" exists as a physical structure bear on this issue. *See Pilgrim Place Condo. Ass'n v. KRE Props.*, 666 A.2d 500, 502 (Me. 1995) ("[t]he Act implicitly recognizes that the creation of units owned by the declarant and the concomitant obligation to pay assessments may occur prior to the actual construction of the physical units.").

**b. The Maine Condominium Act does not provide a basis for the Association to assess common expenses against the Declarant's interests in condominium real estate other than its declared units.**

The Association argues that it is authorized to assess common expenses against the

11

Declarant's undeclared units pursuant to the Maine Condominium Act. *See* 33 M.R.S. §§ 1603-107(b), -115(c)(2) (2023). "Common expenses" is defined specifically to mean "expenditures made by or financial liabilities of the association, together with any allocations to reserves." *Id.* § 1601-103(5).

First, section 1603-107(b) provides that "the declarant alone is liable for all expenses in connection with real estate subject to development rights." *Id.* § 1603-107(b). This statute, however, only applies to claims for payment made by others in the context of upkeep of the condominium. In other words, it relates to claims flowing from "maintenance, repair and replacement" of real estate subject to development rights, distinguished from a condominium's units and its common elements. *See id.* § 1603-107(a). It does not apply to common expense assessments by a condominium association against declared condominium units. *Compare id.* §§ 1602-107(a), (b) ("[t]he declaration shall allocate a fraction or percentage of undivided interests in the ... *common expenses of the association ... to each unit*") *with* § 1603-107(b) ("[i]n addition to the liability which a declarant has ... as a unit owner, the declarant alone is liable for all *expenses in connection with real estate subject to development rights*") (emphasis provided). Section 1603-107 does not provide a legal basis to assess common condominium expenses against the Declarant's interests in condominium real estate that do not constitute declared units.[10]

Next, the Maine Condominium Act provides, in relevant part, that "[t]o the extent required by the declaration ... Any common expense benefiting fewer than all of the units shall be assessed

---

[10] The Association is concerned that the Declarant makes no contribution to common expenses for its real estate interests that have not been declared as units. In other words, the Declarant owns real estate that may burden the Association, but it does not pay common expense dues for that real estate. However, there is no statutory authority that would permit the Association to assess common expense assessments against the Declarant's condominium real estate until such time as it is declared as a condominium unit by amendment to the Declaration. If there was evidence of specific expenses burdening the Association arising from the undeveloped real estate, then section 1603-107(b) may apply. The record here does not reflect any expenses associated with the real estate in question that burden the Association.

exclusively against the units benefited." *Id.* § 1603-115(c)(2). This provision is operative only as to units that benefit from a common expense to the exclusion of other units, which expense does not arise from a limited common element. Jerry Howland Aff., Ex. 3, § 4.1 [hereinafter Bylaws] ("[t]he maintenance and repair costs of a limited common element and any other common expense which benefits fewer than all of the units, even though not arising from a limited common element, shall be assessed exclusively against those units which it benefits, in the same proportion as their allocated percentages of common expense liability bear"); *see also* Declaration § 11.1(D) (defining "Common Expenses"). It does not apply here, where (1) the Association seeks to assess common expenses against undeclared "units," which do not exist until declared for purposes of liability for common expenses assessments, and (2) there are no record facts indicating that any of the Declarant's units benefit from a common expense to the exclusion of the common elements or to the other units in the Condominium.

### c. Whether a certificate of occupancy was issued for a unit does not control its liability for common expense assessments.

The Declarant argues that according to the Declaration, it cannot be liable for assessments on any of its units until such time as a certificate of occupancy is issued for them. *See* Declaration § 11.1(D). However, the Law Court interprets the Maine Condominium Act to prohibit "discrimination in favor of the declarant in the allocation of liability for common expenses." *Pilgrim Place Condo. Ass'n*, 666 A.2d at 502 (interpreting 33 M.R.S. § 1602-107). The language in the Declaration limiting assessment of a unit until the issuance of a certificate of occupancy is limited to units owned by the Declarant. This is discrimination favorable to units owned by the Declarant that is prohibited by statute.

The Declarant argues that the limitation imposed by the Declaration on its liability for common expense assessments against units that it owns merely places it on equal footing with

13

other unit owners. According to the Declarant, this is because the Maine Condominium Act restricts conveyance of a condominium unit to a purchaser until the unit is substantially completed, as evidenced by a certificate of occupancy. 33 M.R.S. § 1602-101 (2023). Thus, the Declarant cannot convey any of its units to a third party until a certificate of occupancy is issued for the unit. However, this would mean that the Declarant is not liable for its unbuilt declared units' allocations of common expenses, which is inconsistent with the Declaration's allocation of interests. *See* Declaration § 2.4.

### d. Whether summary judgment is appropriate on Count III of the Association's Complaint or on Count III of the Declarant's Counterclaim.

First, for the reasons discussed above, the court denies the Association's Additional Motion for Partial Summary Judgment concerning Count III of its Complaint insofar as it seeks payment of common expenses assessed against the Declarant's real estate interests in the Condominium that are not declared units. The court also grants the Association's motion to the extent it concerns assessments made against the Declarant's three non-exempt declared units. The Association's denial of the Declarant's claimed right to vote its unbuilt declared units does not provide the Declarant a defense excusing it from payment of common expenses for its declared units. Declaration, § 11.3 (unit owners to pay assessments "without any deduct or offset whatsoever.")

Even though the Association was and is authorized to make assessments against the Declarant's non-exempt declared units, those assessments must be consistent with the allocations provided by Schedule C of the Declaration. Accordingly, the court grants summary judgment on Count III of the Declarant's Counterclaim and declares that the assessment methodology that the Association began using during March of 2021 is inconsistent with the Declaration and unlawful. The Association's may levy assessments against declared units only to the extent the assessments are consistent with the Declaration's Schedule C.

14

## II. The Declarant's entitlement to vote its declared units.

According to the Association's bylaws, the Condominium unit owners may vote at the Association's annual meeting to elect officers to its board. Declaration §§ 2.1, 2.4. "The declarant is the owner of any unsold units and may vote." *Id.* § 2.4. After the unit owners assumed control of the Association, the Association adopted the position that the Declarant is not entitled to vote its unbuilt units. This position is based on the Association's interpretation of the Declaration to require a "unit" to have a foundation in the ground. *See Id.* § 2.2.

The Association bases its position on the provision of the Declaration entitled "Unit Boundaries," which establishes the bounds of condominium units relative to one another and to the common elements. *Id.* The Maine Condominium Act requires a condominium declaration to describe the boundaries of each unit created thereby. 33 M.R.S. § 1602-105(5) (2023). It also provides a gap-filler provision that becomes operative if a declaration does not include such a description and is silent regarding the condominium's units' boundaries. *Id.* § 1602-102. Inclusion in the Declaration of the description of unit boundaries as required by statute has no bearing on a unit owner's right to vote their unit in Association matters. Moreover, just as "[n]o provision of the [Maine Condominium Act] requires any distinction between built and unbuilt units in the assessment for common expenses," *Pilgrim Place Condo. Ass'n*, 666 A.2d at 502, no provision requires such a distinction in the context of unit owners' votes.

In addition to a description of unit boundaries and allocation of interests in the common elements and expenses, the Maine Condominium Act also requires condominium declarations to "allocate a ... a portion of the votes in the association to each unit." 33 M.R.S. § 1602-107(a). Consistent with this requirement, the Declaration provides that "each unit shall have one equal vote as a member of the Association." Declaration § 2.4. This and related provisions of the Declaration control the issue presented by Count IV of the Counterclaim. And, as with common

15

element interest and common expense liability, the allocations of unit votes are shown in the Declaration's Schedule C. Every time a unit is added to the Condominium, the Declaration requires an amendment to reallocate unit votes to achieve the one-vote-per-unit ratio. *Id.* § 4.1. The result is that, consistent with the Declaration, each declared unit must be allocated one vote in Association matters.

In opposition to the Declarant's motion, the Association provided the court with little authority supporting its denial of the Declarant's right to vote its unbuilt declared units. *Compare Riverstone Creek Condo. Owners Ass'n v. Hall*, 902 N.W.2d 809, 2017 Wisc. App. LEXIS 528, at *8-9 (Wisc. Ct. App. July 18, 2017) (rejecting contention, based upon the declaration's definition of "what parts of a building are included in a unit," that the declaration limited voting rights to constructed units), *with Northernaire Resort & Spa, LLC v. Northernaire Condo. Ass'n*, 839 N.W.2d 116, 119, 121 (Wis. Ct. App. Sept. 17, 2013) (concluding, based in part on the declaration's definition limiting the meaning of "unit" to "a structure," the declarant was entitled to a single vote for each constructed unit it owned but not for its unbuilt units). Instead, these cases provide further support for the proposition that a condominium declaration's terms control allocation of voting rights and powers to and among unit owners.

**III.    The two months' common expense charges collected by the Declarant from new unit owners.**

The Association claims that it is entitled to $3,946.80 from the Declarant, or the sum of two-months' estimated common expense charges collected by the Declarant on eight units contemporaneously with the closing on those units. The Declaration authorized the Declarant's collection of these funds, and specifically obligated it to deposit the funds into a working capital fund account for the Association. Declaration § 11.1. That account was to be established as a *segregated* account. *Id.* (emphasis provided). The Association submits that after the Declarant

16

collected the prepayments from new unit owners, it either kept the funds collected or deposited the money into the Association's operating bank account but not into a segregated working capital fund account.

The check ledger for the Association's operating bank account discloses account activity for the period beginning January 1, 2015, through March 1, 2021.[11] Kelm Aff., Ex. 37. The ledger and bank statements supplied by the Declarant show deposits into one of the Association's bank accounts related to the six closings that occurred between January 1, 2015 and March 1, 2021. *Id.*; Jerry Howland Aff., Ex. 18. However, absent from the summary judgment record is any evidence of a working capital fund account established separately from the Association's operating bank account and into which the Declarant deposited the funds at issue pursuant to the Declaration. The failure to establish such an account and to house these funds therein constitutes a breach of the Declaration by the Declarant. Accordingly, the court grants summary judgment in part for the Association on Count V of its Complaint, and denies the Declarant's cross-motion on Count V of its Counterclaim, to the extent there is no genuine issue of material fact that the money was placed in a segregated account.

Although here the court grants summary judgment for the Association, the questions of whether the claimed funds were improperly spent or the Association sustained any injury as a result of the Declarant's breach present factual issues for trial.

IV. **The parties' dispute regarding the $15,000 loaned by the Declarant to the Association.**

The Association bases its claim that it is entitled to a declaration that it is not obligated to repay $15,000 that it allegedly borrowed from the Declarant on: (1) the provision of the Maine

---

[11] Therefore, it is inadequate record evidence to decide this issue with respect to the payments the Declarant allegedly collected from the four closings that occurred prior to January 1, 2015.

Condominium Act providing that "the declarant alone is liable for all expenses in connection with real estate subject to development rights," 33 M.R.S. § 1603-107(b), and (2) the absence of a promissory note or documentation of the loan. The Declarant argues that the Association's board directors and members were aware of the loan, never objected to repayment, and in fact acknowledged their obligation to repay it. It asserts it is entitled to a summary judgment on Count VI of its Counterclaim under an equitable theory of unjust enrichment.

Turning first to the Association's arguments, section 1603-107 does not provide a means for the court to grant the Association the declaratory relief it seeks as a matter of law. The loan in question was made to cover a budgetary shortfall caused by a unit owner's refusal to pay common expense assessed on their unit. As noted above, section 1603-107(b) contemplates "expenses in connection to real estate subject to development rights," distinguished from common expense dues assessed against condominium units. *Id.*

Next, the absence of a promissory note or other documentation of the loan in question is not necessarily dispositive proof that no money was borrowed from the Declarant by the Association. The existence and terms of an oral contract concerning the loan are disputed material facts for the factfinder to resolve. *See Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903. Additionally, the Declarant presented evidence of deposits in the amount of $15,000 into the Association's operating bank account. Kelm Aff., Ex. 37; Jerry Howland Aff., Ex. 16. It also produced the Association's annual meeting minutes acknowledging that the Declarant "fronted" funds to the Association for reimbursement.

> Jerry explained that SWH Properties is lending the association the fees that unit 10 is accumulating until the issue is resolved. Once resolved the association will reimburse SWH Properties. This was discussed as being a HOA matter and not a developer matter because the fees owed are for association expenses as outlined in the Condo Association Docs. ... It was explained that SWH Properties is fronting the money for unit 10 so that the association monthly fees won't increase while we

18

wait for a resolution.

Jerry Howland Aff., Ex. 15. Viewing this record evidence in the light most favorable to the Declarant, it is enough to generate a fact dispute for summary judgment purposes.

Turning to the Declarant's cross-motion, viewing the record evidence in the light most favorable to the Association, whether the Association became obligated to repay the Declarant's claimed loan is a disputed issue of material fact. There is no evidence of an agreement by the Association to accept a loan for repayment, even if there is evidence of the Association's board directors' and members' knowledge of the loan. Nor is there any evidence of the purported loan's terms. Moreover, the Declarant lent the $15,000 to the Association during a time when (1) it served the Condominium as declarant, (2) its principals controlled the Association's board, and (3) after the expiration of the period of declarant control. Then, the Declarant and its principals overseeing the Association's board owed the Association fiduciary duties. *See* 33 M.R.S. §§ 1601-113, 1603-103(a) (2022); 13-B M.R.S. § 717 (2023).

Viewing these facts in the light most favorable to the Association, there is a disputed issue of material fact regarding whether the Association's acceptance and retention of the loaned funds were "under such circumstances as to make it inequitable for it to retain the benefit" of the purported loan "without payment of its value." *Knope v. Green Tree Servicing, LLC*, 2017 ME 95, ¶ 12, 161 A.3d 696 (citation omitted).

For these reasons, the court denies the Association's Additional Motion for Partial Summary Judgment on Count VI of its Complaint, as well as the Declarant's Cross-Motion for Additional Partial Summary Judgment on Count VI of its Counterclaim.

## V. The parties' entitlement to costs and attorney's fees.

Attorney fees may be awarded only when provided for by statute or agreement by the parties. *Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 25, 775 A.2d 1166. For its

19

part, the Maine Condominium Act limits recovery of attorney's fees and costs resulting from a declarant's tort or contract liability to breaches that occur or accrue during the period of declarant-control of the condominium association. 33 M.R.S. 1603-111 (2023). Meanwhile, the Declaration provides that "[e]ach unit is subject to a lien in favor of the Association for the unpaid common expense assessments, interest and costs of collection ... 'Costs of collection' shall include reasonable attorney's fees incurred by the Association in connection with any enforcement of the Declaration." Declaration § 11.1(D).

The court may also award attorney's fees for breaches of fiduciary duties. *See Murphy v. Murphy*, 1997 ME 103, ¶ 15, 694 A.2d 932. A condominium association owes fiduciary duties to its members, the unit owners. *Seacoast Hangar Condo. II Ass'n*, 2001 ME 112, ¶ 19, 775 A.2d 1166 (citing 13-B M.R.S. § 716 (1981)).

Even though the court grants a summary judgment to each party on a claim that may entitle it to attorney's fees, the court declines to grant any such award until a final judgment is issued in this case.

## CONCLUSION

Based on the foregoing, the entry will be:

1. The Village at Ocean's End Condominium Association's Additional Motion for Partial Summary Judgment is denied on Count III of its Complaint insofar as it concerns the Declarant's real estate interests other than its declared units, but the motion is granted regarding the Declarant's declared units. The record does not reflect the amount owed for only declared units so the court does not enter summary judgment on the amount owed at this time.

2. The Association's motion is granted concerning Count V of its Complaint in that there

20

is no dispute that the funds were not placed in a segregated account. It is otherwise denied as there are factual issues whether or how much the Association was damaged.

3. The Association's motion is denied on Count VI of its Complaint.

4. The Association's motion is denied with respect to attorneys fees.

5. The Defendants' cross-motion is also denied on Count III of the Counterclaim insofar as it concerns the Declarant's declared units, but it is granted regarding the Declarant's real estate interests other than its declared units.

6. The cross-motion is also granted respecting Count IV of the Counterclaim. Any declared units have the right to vote.

7. The cross-motion is denied on Counterclaim Counts V and VI.

So ordered.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date: June 12, 2023

Thomas R. McKeon
Justice, Business & Consumer Court

Entered on the docket: 06/13/2023

21